**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Navtej KOHLI, aka Tej Kohli,
Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Edward Charles MYERS, aka Charles
Edward Myers, aka Charles Myers,
Defendant–Appellant.**

Nos. 94–50648, 94–50650.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 18, 1996.

Decided April 14, 1997.

Richard Hanson, Allen, Hansen & Maybrown, Seattle, Washington, Loretta S. Shartsis, Pine Mountain, California, for defendants-appellants.

Peter S. Spivack and Christopher M.E. Painter, Assistant United States Attorneys, Los Angeles, California, for plaintiff-appellee.

Before KOZINSKI and LEAVY, Circuit Judges, and SCHWARZER,* Senior District Judge.

PER CURIAM:

## FACTS AND PROCEDURAL BACKGROUND

Defendants Navtej Kohli and Charles Myers were charged with conspiracy and mail fraud in executing the so-called Prime Cardinal scheme to defraud *bona fide* sellers of residential property by fraudulently inducing them to sell to strawbuyers, by compensating the sellers in part with payment notes on which the defendants later defaulted, and by fraudulently inducing lenders to make loans on the properties after inflated appraisals. Kohli and Myers diverted the loan proceeds to their own use and defaulted. In addition, Kohli was charged with mail fraud in executing the so-called Argent Alliance scheme by fraudulently soliciting funds from prospective investors in a project to convert apartment buildings into condominiums and misappropriating the funds.

After entering into a plea agreement with the government, Kohli pleaded guilty to all eleven counts in the Third Superseding Information. Count One charged a conspiracy to commit mail fraud. *See* 18 U.S.C. § 371. Counts Two through Eight charged mail fraud offenses in connection with the Prime Cardinal scheme. *See* 18 U.S.C. § 1341. Counts Nine through Eleven charged mail fraud offenses in connection with the Argent Alliance scheme. *See id.* The base offense level for fraud under the U.S. Sentencing Guidelines Manual section 2F1.1(a) (1995) [hereinafter "U.S.S.G."] is six; the district court imposed a fifteen-level enhancement for causing a loss of more than $10,000,000, *see* U.S.S.G. § 2F1.1(b)(1)(P), a two-level enhancement for more than minimal planning and more than one victim under Guideline section 2F1.1(b)(2), a four-level enhancement for having individually derived in excess of $1,000,000 from a crime that affected a financial institution, *see* U.S.S.G. § 2F1.1(b)(6)(B), and a three-level enhancement for role in the offense under Guideline section 3B1.1(b). After deducting three levels for acceptance of responsibility, the court arrived at a total offense level of twenty-seven, which, based on Kohli's criminal history category of I, resulted in a sentencing range of 70 to 87 months. Accepting the government's recommendation, the court sentenced Kohli to eighty months and ordered restitution of $5,000,000.

Myers, the junior partner in the scheme, also entered into a plea agreement and pleaded guilty to the conspiracy count and to seven counts of mail fraud in the Second Superseding Indictment. The court computed his sentence by increasing the base offense level of six by thirteen levels for having caused a loss of more than $2,500,000, *see* U.S.S.G. § 2F1.1(b)(1)(N), by four levels for having derived more than $1,000,000 from a crime that affected a financial institution, *see* U.S.S.G. § 2F1.1(b)(6)(B), by two levels for more than minimal planning, *see* U.S.S.G. § 2F1.1(b)(2), and by three levels for "manag[ing] or supervising" the conspiracy. *See* U.S.S.G. § 3B1.1(b). After deducting three levels for acceptance of responsibility, the court arrived at an offense level of twenty-five and a criminal history category of I; the applicable sentencing range was fifty-seven to seventy-one months. At the government's recommendation, the court sentenced Myers to sixty months and ordered restitution of $1,600,000.

Both defendants appeal their sentences. We have jurisdiction under 18 U.S.C. section 3742(a) and affirm in part and reverse in part.

## DISCUSSION

### I. STANDARD OF REVIEW

We examine for clear error the district court's factual findings underlying a sentence. *United States v. Mullins*, 992 F.2d 1472, 1479 (9th Cir.), *cert. denied*, 509 U.S.

---

* Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

905, 113 S.Ct. 2997, 125 L.Ed.2d 691, 510 U.S. 994, 114 S.Ct. 556, 126 L.Ed.2d 457 (1993). We review interpretations of the Sentencing Guidelines *de novo.* *Id.* at 1478–79.

## II. THE FINANCIAL INSTITUTION ENHANCEMENT

### A. *Application of Guideline § 2F1.1(b)(6)(B)*

■ Guideline section 2F1.1(b)(6)(b) provides a four-level enhancement "[i]f the offense ... affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense." U.S.S.G. § 2F1.1(b)(6)(B). Both defendants contend that the $1,000,000 must be derived from a single financial institution.[1] The plain language of the guideline refutes the contention. It requires only (1) that the offense "affected a financial institution," and (2) that the defendant derived more than $1,000,000 "from the offense." There is no basis for requiring that the $1,000,000 be derived from a single financial institution. Application Note 16 confirms the broad sweep of this guideline:

"Gross receipts from the offense" includes all property ... which is obtained directly or indirectly as a result of such offense.

U.S.S.G. § 2F1.1 n. 16.

The critical factor in the application of this enhancement is that it turns on the culpability of the individual defendant. Application Note 11 states that the language of subsection (b)(6)(B) "generally means that the gross receipt to the defendant individually, rather than to all participants, exceeded $1,000,000." U.S.S.G. § 2F1.1(b)(6)(B) .16. Thus, that the defendants were convicted of conspiracy does not impose joint liability on them for purposes of the financial institutions enhancement. *Cf. Pinkerton v. United States,* 328 U.S. 640, 643–44, 66 S.Ct. 1180, 1182, 90 L.Ed. 1489 (1946) (distinguishing between culpability for participating in a conspiracy and culpability for commission of a substantive offense). The sentencing court must determine the amount derived from the offense by each defendant individually. *United States v. Millar,* 79 F.3d 338, 346 (2d Cir.1996). It follows that in making that determination, no part of the amount found to have been derived by one defendant can be counted as having been derived by another defendant.

### B. *Kohli*

■ Relying on the Presentence Report, the district court found that the elements necessary for the application of Guideline section 2F1.1(b)(6)(B) existed. The Presentence Report states that a breakdown of the proceeds to Kohli from the fraudulent Prime Cardinal scheme shows that he received $1,696,979.24. Kohli contends that "there is no evidence that [he] personally derived anywhere close to that [$1,000,000] amount."

The Presentence Report adopts the findings in the report of the government's expert witness, FBI Special Agent Joel D. Brillhart, who made an investigation and analysis of bank real estate and loan records for the twelve transactions constituting the Prime Cardinal scheme. That analysis attributed to Kohli loan proceeds in the amount of $1,696,979.24 distributed directly to him or to an entity controlled by him out of each escrow, or delivered to him by Myers.

Kohli takes issue with the Brillhart analysis by arguing that it ignores subsequent transfers from Kohli to Myers and, in lesser amounts, to other business associates. Spreadsheets submitted by Kohli's expert, William E. McAleer, indicate that substantial transfers did occur among Kohli and his co-conspirators-but regardless of the amount that Kohli disbursed, there is no doubt that he himself derived in excess of $1,000,000 from the enterprise.[2] As noted above, the

---

1. There is no dispute that the offense affected a financial institution.

2. Kohli takes issue with some of the items included in the calculation. In the aggregate, their elimination would not bring the amount derived by him to less than $1,000,000. The principal contested item is a payment of $220,005 to Le Pointe Development, Inc. out of the 21511 Deerpath Lane escrow. Kohli argues that he had no connection with Le Pointe and derived no funds from it. The evidence shows, however, that while Le Pointe was held in the names of Myers and Douglas Sefton, Sefton acted as a strawbuyer for Kohli and held the interest for his benefit. Furthermore, pleading guilty to the third superseding indictment, Kohli admitted that he "created and controlled ... Le Pointe Development, Inc."

definition of "gross receipts" encompasses funds controlled by the defendant before he compensates his cohorts. There is ample evidence to support the district court's finding that Kohli derived more than $1,000,000 from the offense. *See United States v. Wilson,* 900 F.2d 1350, 1354 (9th Cir.1990) (holding that "factual determinations underlying application of the Guidelines [must be made] at least by a preponderance of the evidence").

The government attributed to Kohli not only funds received directly from escrow but also funds delivered to him by Myers. On the record, the government was entitled to do so, but it could not then attribute the same funds to Myers as well.

### C. *Myers*

■ The court made no finding with respect to the amount derived by Myers from the offenses. The Presentence Report states that he received $598,348.92. That amount was taken from the Brillhart report, which found that "Myers received a total of approximately $1,519,989.16 of which he transferred $921,640.24 to Kohli, leaving him with $598,-348.92 of the loan proceeds."

In its brief, the government now argues that Myers received $1,519,989.16 of the fraudulent loan proceeds but does not explain why we should reject the calculation offered in the district court. If the government wishes to attribute to Myers funds he delivered to Kohli, it would have to show that those funds were not counted in the calculation of the amount derived by Kohli; the record shows, to the contrary, that its analysis of funds derived by Kohli includes funds received from Myers.

The government also argues that "defendants" received properties having an appraised value at the time of foreclosure of at least $6,000,000. As noted above, however, the guideline requires proof that the amount derived by "the defendant individually, rather than all participants, exceeded $1,000,000." U.S.S.G. § 2F1.1 n. 16. Moreover, these properties, according to the government, secured loans of over $7,500,000, leaving defendants without any equity; it is therefore difficult to see how they "derived" anything from control over the encumbered properties.

In any event, the district court made no finding of how much Myers derived and did not explain the rationale for imposing the section 2F1.1(b)(6)(B) four-level enhancement. We must therefore vacate Myers' sentence with respect to the imposition of the financial institution enhancement only and remand for resentencing consistent with this opinion.

### III. CALCULATION OF THE LOSS

#### A. *Kohli*

The district court found that "in Mr Kohli's case the amount of losses sustained as a result of the offense behavior in Counts 1 through 8 was approximately $4.9 million and on Counts 9, 10, and 11 was in excess of ... $11 million for a total loss of more than $10 million ... requiring a 15–level increase [under Guideline § 2F1.1(b)(1)(P) ]." The court did not explain how it arrived at the loss figures. Kohli contends that the record does not support those figures.

1. *Counts One through Eight.* Kohli attacks the government's calculation of losses from the Prime Cardinal scheme. His first argument appears to be that the government failed to take into account amounts recovered by the *bona fide* sellers of the properties and by the lenders. As for the sellers' losses, there is no significant difference between the parties. The amount of victim seller losses computed by Kohli's expert (McAleer) is $2,700,000; Brillhart calculated the losses to be $2,745,000.

With respect to the claimed losses of lenders, McAleer's declaration asserts that the lenders had reserved an adequate cushion to protect the value of their first deeds of trust on these properties; no lender lent more than eighty percent of appraised value and the average was sixty-nine percent of appraised value, well below industry standard. Once a lender foreclosed, it had the option of selling at a "fire sale" or of holding the property in anticipation of a rise in the market. The declaration details several instances in which properties involved in the scheme were sold at foreclosure at prices well below comparable sales in the area at the time. In response, the Brillhart declaration argues that comparing sales data is not meaningful

because of the great variation in values among residential properties. More importantly, Brillhart submitted data showing that, as a result of the fraudulent appraisals submitted by Kohli in support of the loans, the amounts of the loans exceeded the lender's own later appraisals by as much as eighty-three percent of the appraised value. Based on his investigation, Brillhart concluded that the losses incurred by the lenders aggregated $2,271,207.52. The court's finding of total losses of $4,900,000 from the Prime Cardinal scheme was not clearly erroneous.

2. *Counts Nine through Eleven.* The government produced evidence to show that the losses suffered by investors in the Argent Alliance scheme who were given junior trust deeds amounted to $6,308,410. The Brillhart report derives this amount from an itemization of the investments of the junior lienholders in each of the eight properties involved in the scheme.

Kohli argues first that Argent Alliance had no interest in four of the properties. Even if, as Kohli claims, title to those properties were held by Pentagon/Rodeo Hills, an earlier Kohli venture, it is not disputed that Kohli was the president of Rodeo Hills as well as of Argent Alliance, that the latter controlled and promoted the sale of these properties, and that Argent Alliance funds were used to service their obligations. Moreover, the supporting documentation shows that the losses were incurred during the time the Argent Alliance scheme was operating (March 1989 through August 1990), after Pentagon/Rodeo Hills had ceased doing business.[3]

Kohli argues further that the government's calculation of losses on the Stockdale (Argent Alliance) project failed to account for the majority of amounts recovered by victims, which he claims would reduce the loss by at least $480,000. The government's loss calculation, however, was limited to junior lien-

holders who were foreclosed out of their properties. Brillhart's investigation concluded that junior lienholders had no equity in their properties. The district court's findings were not clearly erroneous.

### B. *Myers*

The court made a finding that the loss attributable to Myers was between $2,500,000 and $5,000,000. As the preceding discussion shows, there is ample evidence that the Prime Cardinal scheme resulted in losses aggregating nearly $5,000,000. Myers argues that the losses were less than $2,500,000 but does so on the strength of a chart that omits six of the twelve Prime Cardinal properties, accounting for approximately $1,674,000 in losses. In any event, McAleer computed sellers' losses at approximately $2,700,000, sufficient to support the thirteen-level enhancement under section 2F1.1(b)(N). The district court's finding was not clearly erroneous.

### IV. ENHANCEMENT FOR MORE THAN MINIMAL PLANNING

Kohli and Myers complain that the court imposed the two-level enhancement for more than minimal planning under Guideline section 2F1.1(b)(2) in addition to the three-level enhancement for role in the offense under section 3B1.1. They concede, however, that under Ninth Circuit law, which binds us, this is not double counting. *See United States v. Camper,* 66 F.3d 229, 232 (9th Cir.1995) (citing *United States v. Kelly,* 993 F.2d 702, 704 (9th Cir.1993)). Their claim is therefore frivolous.

### V. THE RESTITUTION ORDER

Myers complains of the restitution order against him. His counsel submitted to the order at the sentencing hearing. In the ab-

---

**3.** Kohli argues that taking into account losses from the Pentagon/Rodeo Hills scheme in the guideline calculation violates paragraph 6(a) of the plea agreement, in which the government agreed not to "charge [him with] any additional offenses relating to [his] past involvement with ... Pentagon Investment Group, Inc., [and] Rodeo Hills Equities, Inc." The plain language of the agreement does not preclude counting for sentencing purposes losses suffered in commonly controlled and interconnected operations con-

temporaneous with Argent Alliance. Moreover, taking these losses into account as "relevant conduct" with respect to the charged offenses does not amount to charging Kohli with an "additional offense." *See* U.S.S.G. § 1B1.3(a)(3) (stating that "the base offense level ... shall be determined on the basis of ... all harm that resulted from" acts committed by the defendant that occurred during the commission of the offense or in preparation for that offense); *United States v. Fine,* 975 F.2d 596, 599–600 (9th Cir.1992).

sence of plain error, and none is shown, any error is waived.

## VI. MYERS' MOTION FOR BAIL

Myers moved for release on bail pending resolution of his appeal and then withdrew that motion in order to file his bail request first in the district court. We therefore do not address the merits of Myers' motion; we expect the district court to address the motion in light of our disposition of this appeal.

## CONCLUSION

We therefore VACATE Myers' sentence insofar as it rests on application of the financial institution enhancement and REMAND for determination whether the evidence supports imposition of the financial institution enhancement. In all other respects the sentences are AFFIRMED.