UNITED STATES of America,
Plaintiff–Appellee,

v.

Steven NESENBLATT, Defendant–
Appellant.

No. 98–50293.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 5, 1999.

Decided March 29, 1999.

Stanley I. Greenberg, Los Angeles, California, for the defendant-appellant.

Dorothy Shubin and Jean Rosenbluth, Assistant United States Attorneys, Los Angeles, California, for the plaintiff-appellee.

Before: PREGERSON and RYMER, Circuit Judges, and BREYER,* District Judge.

BREYER, District Judge:

Steven Nesenblatt pled guilty to one count of conspiracy and three counts of wire fraud, arising out of a $260 million bank fraud scheme. He appeals the district court's four-level enhancement of his sentence pursuant to Sentencing Guideline section 2F1.1(b)(6)(B) for deriving more than one million dollars in gross receipts from his offense. We have jurisdiction under 18 U.S.C. section 3742, and we affirm.

**I**

Nesenblatt and others were indicted in the Central District of California in a 33 count first superseding indictment alleging bank fraud, making false statements to obtain bank loans, mail fraud, wire fraud, bank bribery, money laundering, and conspiracy to commit these substantive offenses. The indictment arose out of a scheme whereby Nesenblatt and his co-conspirators submitted false and misleading information to banks to obtain loans on behalf of Bruce McNall and several of McNall's business entities ("McNall entities"). McNall owned, operated, and controlled numerous entities, including the Los Angeles Kings hockey team; film production and distribution companies; thoroughbred · racing and breeding stables; and trading and auction houses which specialized in rare coins, antiquities, and sports memorabilia. By the time the fraud was uncovered, McNall and his entities had obtained over $260 million in bank loans on the basis of false or misleading information.

Nesenblatt served as an attorney, vice chairman, and consultant for various McNall entities, including McNall Sports and Entertainment, a holding company which owned and managed McNall's various business entities. From 1988 through 1993, Nesenblatt was paid $500,000 in annual salary. McNall and the McNall entities also paid Nesenblatt an additional $2.3 million in cash, checks, and wire transfers during this same period.

Nesenblatt subsequently pled guilty to conspiracy and three counts of wire fraud pursuant to a plea agreement with the government. At sentencing, the district court found that Nesenblatt's base offense level was six, and then added 18 levels after finding that the amount of loss caused by Nesenblatt's fraud was more than $80 million. The district court also added two levels on the ground that the fraud required more than minimal planning, four levels for Nesenblatt having derived more than one million dollars from an offense that affected a financial institution, and three levels for Nesenblatt's role as a manager or supervisor, resulting in a total offense level of 30. The district court departed downward on several grounds, and imposed a sentence of 13 months imprisonment. Nesenblatt appeals only the four-level enhancement for deriving more than one million dollars from his offense.

**II**

We review the district court's interpretation of the Sentencing Guidelines *de novo*. *See United States v. Kohli*, 110 F.3d 1475, 1477 (9th Cir.1997), citing *United States v. Mullins*, 992 F.2d 1472, 1478–79 (9th Cir.1993). The district court's factual findings underlying a sentence are reviewed for clear error. *See id.* at 1476.

**III**

Section 2F1.1(b)(6)(B) provides a four-level enhancement in a defendant's offense level if the offense "affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense." U.S.S.G. § 2F1.1(b)(6)(B)(1995).[1]

---

* Honorable Charles R. Breyer, District Judge for the Northern District of California, sitting by designation.

1. Section 2F1.1(b)(6)(1995) is currently designated as § 2F1.1(b)(7).

The Application Note specifies that "gross receipts from the offense" means "gross receipts to the defendant individually, rather than to all participants," and "includes all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense." Application Note 16 (1995).[2] The district court expressly found that at least one million of the more than three million dollars paid by McNall and McNall entities to Nesenblatt was derived "directly or indirectly" from Nesenblatt's bank fraud offense.

Nesenblatt contends that the district court erred because (1) it did not find that the payments to Nesenblatt were derived from his offense as opposed to legitimate business activities, and (2) it failed to find that the funds justifying the enhancement of his sentence had not been attributed to any other co-conspirator for purposes of the same sentencing enhancement.

A

■ Nesenblatt argues that under our decision in *United States v. Kohli*, 110 F.3d 1475 (9th Cir.1997), the district court erred because it did not make sufficient findings to support the sentence enhancement. According to Nesenblatt, the court merely assumed that because a substantial amount of money was obtained by McNall and the McNall entities as a result of the bank fraud, any money which McNall and the McNall entities paid to Nesenblatt was directly or indirectly "derived" from Nesenblatt's offense. He contends that the McNall entities were legitimate businesses producing legitimate revenues, and that if given the opportunity, he could prove that the non-salary payments made to him followed legitimate infusions of revenue into the businesses and therefore the payments were not derived from his offense.

The government asserts that the payments to Nesenblatt were derived from his offense because the fraudulent bank loans kept the McNall entities operating. It contends that the McNall entities were

effectively insolvent as of the late 1980s. Therefore, the government argues, although the McNall entities did generate some legitimate income, the $260 million in illegal loans were essential to the entities' continued existence, and the millions of dollars paid to Nesenblatt during this period were at least indirectly derived from his bank fraud offense.

■ A district court's factual findings underlying application of the Sentencing Guidelines must be made by a preponderance of the evidence. *See United States v. Wilson*, 900 F.2d 1350, 1354 (9th Cir.1990). There is ample evidence in the record to support the district court's finding that Nesenblatt derived more than one million dollars from his offense. Nesenblatt does not dispute that during the relevant period he received from McNall or McNall entities approximately $2.3 million in cash, checks and wire transfers in addition to his regular salary. At the trial of Nesenblatt's co-defendant, Mark Eastman, the accountant for the bankruptcy trustee testified that, from sometime prior to 1988 through the present date, McNall and all of his entities were insolvent, that is, that their liabilities exceeded their assets. Nesenblatt himself testified that virtually all of McNall's businesses were continuously financed almost exclusively through bank loans and that the loans became the primary source of operating funds for McNall and his entities. He testified further that he could not even remember a time when the McNall entities were able to pay all the bills, and that although there were significant revenues "from the businesses in varying degrees at varying times, there were also large gaps all the time, and [the conspirators] came to rely more and more on filling those gaps with bank loans."

In light of the above evidence, it was not clear error for the district court to implicitly find that the McNall entities were able to continue operating only as a result of Nesenblatt and his co-conspirators' re-

**2.** Application Note 16 (1995) is currently designated as Note 18.

peatedly obtaining fraudulent loan after fraudulent loan. Nor was it clear error for the district court to conclude that any payments the McNall entities made to Nesenblatt were necessarily derived, at least indirectly, from the fraudulently obtained bank loans; without the loans there would not have been any funds available to pay to Nesenblatt.

Accordingly, Nesenblatt's claim that he could prove that the $2.3 million in payments to him followed infusions of legitimate income into the McNall entities, such as Los Angeles Kings season ticket payments, is immaterial. The record supports a finding that without the receipt of over $260 million in illegal bank loans, any infusions of legitimate income would have gone to pay the debts and operating expenses of the businesses, rather than Nesenblatt, or in the alternative, that such income would not have been generated at all because the entities would have gone out of business. A defendant may not escape the application of section 2F1.1(b)(6)(B) by claiming that payments to him were derived from legitimate business activities when those businesses were only able to continue to operate and generate revenue by virtue of the defendant's on-going fraudulent conduct.

Nothing in our *Kohli* opinion suggests a different result. *Kohli* merely requires that the sentencing court "determine the amount derived from the offense by each defendant individually." *Kohli*, 110 F.3d at 1477. The district court did just that when it found that Nesenblatt derived from his bank fraud offense at least one million of the $2.3 million in additional cash payments he received from McNall and McNall entities.

### B

■ Nesenblatt also argues that under *Kohli* the district court was required to find that the gross receipts attributed to Nesenblatt for purposes of the section 2F1.1(b)(6)(B) enhancement were not attributed to any other co-conspirator, and in particular, to Bruce McNall, for purposes of applying the same enhancement.

In *Kohli*, the district court found that defendant Kohli had derived approximately $1.6 million from his real estate fraud and therefore applied section 2F1.1(b)(6)(B). This amount included over $900,000 in funds transferred to him by his co-defendant Charles Myers. The district court also applied the section 2F1.1(b)(6)(B) enhancement to Myers, but did not make any finding concerning the amount derived by Myers from the offense. On Myers's appeal, the government argued that Myers derived approximately $1.5 million from the offense, even though the record showed that this amount included the $900,000 attributed to Kohli for purposes of applying the same enhancement to Kohli's sentence. We reversed and remanded, holding that if the government wished to attribute the $900,000 to Myers, it was required to show that those $900,000 in funds were also not attributed to Kohli. *Kohli*, 110 F.3d at 1478.

Nesenblatt argues that since Bruce McNall stipulated to the application of section 2F1.1(b)(6)(B) to his sentence, the district court was required to find that the receipts used to justify Nesenblatt's enhancement were not also used to justify McNall's enhancement.

The district court did not err. At Nesenblatt's sentencing hearing, the district court stated that the application of the enhancement to McNall was justified on the basis of the fraudulent loans made to McNall personally, without considering the millions of dollars of fraudulent loans to the McNall entities. It was not necessary for the district court to apply to McNall any of the $2.3 million attributed to Nesenblatt in order to accept the parties' stipulation that McNall derived more than one million dollars from his offense. In *Kohli*, in contrast, the district court could not apply the enhancement to Myers without double-counting funds already applied to Kohli for purposes of the same enhancement.

## IV

For the foregoing reasons, Nesenblatt's sentence is AFFIRMED.

AFFIRMED.