**UNITED STATES**

v.

**Richard MAACK, Defendant.**

**Nos. CRIM. A. 98–201,
CRIM. A. 98–578.**

United States District Court,
E.D. Pennsylvania.

July 19, 1999.

Robert K. Reed, Leonard Deutchman, Philadelphia, PA, for plaintiff.

John E. Riley, Philadelphia, PA, Michael J. Kelly, Philadelphia, PA, for defendant.

### MEMORANDUM & ORDER

KATZ, Senior District Judge.

Defendant Richard Maack pleaded guilty to criminal charges arising from two separate cases. On April 29, 1998, Maack pleaded guilty to a five count information in criminal action number 98–201 charging him with mail fraud, wire fraud, and bank fraud.[1] While he was on release awaiting sentencing on that case, he engaged in further criminal conduct that led to new charges in criminal action number 98–578.[2] He pleaded guilty to two counts of bank fraud in that case on November 20, 1998. At a hearing on July 16, 1999, Mr. Maack objected to portions of the consolidated presentence report and requested a downward departure for diminished mental capacity pursuant to U.S.S.G. § 5K2.13. This memorandum provides a fuller description of the court's decision announced from the bench.

### The Presentence Report

The Probation Office recommends and the government agrees that U.S.S.G. § 2F1.1(b)(7)(B)[3] applies to Mr. Maack's case. This provides for a four-level increase in the offense level if the offense "affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense[.]" *Id.* The application note for this section states that this "means that the gross receipts to the defendant individually, rather than to all participants, exceeded $1,000,000. 'Gross receipts from the offense' includes all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense." *Id.* at app. note 18. The defendant objected to application of the enhancement, arguing that the government cannot prove by a preponderance of the evidence that Mr. Maack himself received one million dollars "after taking out legitimate operating expenses for ICS, including payroll, business expenses and company uses[.]" Def. Sent. Mem. at 5.[4]

All parties agree that well over one million dollars was taken in the first case, and the court finds that the government has

---

1. While serving as Chief Operating Officer at Insurance Claims Solutions, Inc. (ICS), a third-party administrator that acted on behalf of insurance companies in administering insurance claims, Mr. Maack illegally took large sums of money from corporate accounts.

2. In that case, he defrauded Brandywine Asset Management, Inc., and Brandywine Securities, Inc. while employed there as a financial consultant. He also defrauded the Tax Lien Exchange (TLE) by writing a series of checks on its account. Mr. Maack was a shareholder in TLE, an Internet trading company that he was developing with others.

3. Both the presentence report and the defendant's papers refer to U.S.S.G. § 2F1.1(b)(6)(b). This was the designation in the previous version of the Sentencing Guidelines. As only the numbering, rather than the language or interpretation, of this clause has changed the court will apply the present designation for accuracy.

4. The plea agreement for 98–201 includes a stipulation that Reliance National Insurance Company is a financial institution within the meaning of U.S.S.G. § 2F1.1(b)(7)(B). Plea Agmt. § 6(iv)(a). The agreement acknowledges dispute as to whether the enhancement applies. *See id.* at (d).

demonstrated by a preponderance of evidence that the enhancement should apply. Mr. Maack argued that money utilized in his business for salaries and other expenses cannot be counted as "gross receipts to the defendant individually." Mr. Maack cites no case law for this proposition, and the court does not believe he could do so. The proper comparison for purposes of this enhancement is between the defendant and other participants, not between the defendant and his business. As there are no other participants, no one besides Mr. Maack can be attributed with the money.[5]

This interpretation is consistent with the case law on the subject. The Third Circuit and other jurisdictions have held that this enhancement applies in any situation in which the defendant maintained control over the monies acquired, whether that be in the form of a business or simply spending the money for personal pleasure. The clearest case in this respect is *United States v. Bennett*, 161 F.3d 171 (3d Cir. 1998). In that case, the defendant transferred much of the money in question to businesses in which he possessed a 100 percent interest. The Third Circuit held that the enhancement was properly applied even though the defendant subsequently used the money to pay consultants and others who did work for defendant's businesses, stating that "it is irrelevant how [defendant] spent the money after he obtained it." *Id.* at 193; *see also United States v. Nesenblatt*, 171 F.3d 1227, 1229–30 (9th Cir.1999) (holding that enhancement was proper when defendant's illegal actions provided inflow of cash necessary for him to receive "legitimate" payments from the companies in question); *United*

*States v. Stolee*, 172 F.3d 630, 631 (8th Cir.1999) (holding that enhancement was properly applied even though money in question was transferred to a company of which defendant was sole owner and president because he indirectly benefitted); *United States v. Kohli*, 110 F.3d 1475, 1477–78 (9th Cir.1997) (holding that "gross receipts" enhancement encompasses funds controlled by defendant before he compensated cohorts); *United States v. Wong*, 3 F.3d 667, 671 (3d Cir.1993) (applying enhancement when defendant transferred portion of money to company because he was an indirect beneficiary). In this case, Mr. Maack was, at the time of the offense, the president of ICS, the company to which he directed part of the proceeds of the crime, and he owned approximately seventy-five percent of the stock in that company. *See* Presentence Report ¶¶ 13, 14. He used ICS to facilitate his illegal actions and thus cannot claim that he did not benefit from monies expended on the company.[6]

There are also a variety of other points about which the defendant has a different interpretation of the events described in the presentence report. Rather than include these as specific objections, the Probation Office simply footnoted each of the defendant's comments. The government addresses each of these points in its sentencing memorandum. The court does not need to resolve any of these issues, though, because either "no finding is necessary because the controverted matter will not be taken into account, or will not affect, sentencing." Fed.R.Crim.P. 32(c)(1).

---

**5.** Contrary to the governments suggestion, the court does not believe that defendant is arguing that other individuals on whom he spent money qualify as "participants" such that his own culpability is mitigated.

**6.** Were the court to adopt a contrary interpretation—that is, that money put into the business for salaries and the like could not be attributed to Mr. Maack's gross receipts—the

government would not have proved by a preponderance of the evidence that the enhancement applied. The presentence report and the government's own submissions do not even make an attempt to distinguish between monies spent directly for personal benefit (e.g., adult entertainment clubs) and those that arguably benefitted the company (e.g., salaries).

*The Motion for Downward Departure*

Mr. Maack moved for a downward departure based on diminished mental capacity. Specifically, he argues that he suffers from a "longstanding compulsive sexual addiction characterized by a narcissistic personality disorder, general anxiety disorder, low self-esteem, and compulsive lying." Def. Sent. Mem. at 6.[7]

In general, the court may grant a motion for a downward departure if it finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b); *see also* U.S.S.G. § 5K2.0. Although the Sentencing Guidelines obviously do not list all circumstances that might warrant a downward departure, they specifically include the basis for departure suggested by defendant, diminished mental capacity. *See* U.S.S.G. § 5K2.13. The Third Circuit has explained that such a departure may be granted where a defendant

> (1) has committed a non-violent offense, (2) while suffering from a significantly reduced mental capacity, (3) that was not caused by the voluntary use of intoxicants, (4) where defendant's mental incapacity contributed to the commission of the offense, and (5) so long as the defendant's criminal record does not indicate a need for imprisonment to protect public safety.

*United States v. Vitale,* 159 F.3d 810, 816 (3d Cir.1998). The Third Circuit has also made it clear that a departure on this basis may be granted either if the person "is unable to absorb information in the usual way or to exercise the power of reason" or if "the person knows what he is doing and that it is wrong but cannot control his behavior or conform it to the law." *United States v. McBroom,* 124 F.3d 533, 548 (3d Cir.1997). That is, the departure is available for both cognitive and volitional defects.

Mr. Maack committed no violent offenses, and while he clearly abused alcohol and possibly other substances, there is no serious suggestion that this caused his alleged mental incapacity. Consequently, the court should look to whether Mr. Maack suffered from significantly reduced mental capacity that contributed to the commission of the offense and whether or not his imprisonment is required for the safety of the general public.[8] As the defendant explicitly states that his mental disorders are not cognitive, the court will look primarily to Mr. Maack's lack of volition. *See* Def. Sent. Mem. at 8.

The defendant argues that sexual addiction was significantly related his conviction because he felt compelled to "acquir[e] and spend[ ] large sums of money to buy sexual favors from, and purchase expensive gifts for, the women involved." Def. Sent. Mem. at 7. Mr. Maack argues that, although he had displayed addictive tendencies since adolescence, his addiction only began to cause problems in his life after he visited an adult club in Atlanta in 1993 or 1994. As the defendant's sentencing memorandum explains, after visiting this club and

> experienc[ing] how powerfully money and sexual behavior interacted, and how

---

7. The government urged the court to exclude the testimony and report of defense witnesses pursuant to *Kumho Tire Company, Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), but the state of the record gave the court no reason to do so.

8. Even though there appears to be no case law on downward departures with respect to sexual addiction, the court has no difficulty in concluding that it has the power to depart on this basis if the prerequisites are met. While mental and emotional conditions are a discouraged basis for a downward departure, *see* U.S.S.G. § 5H1.3, the court may depart if the factor is "present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." *Koon v. United States,* 518 U.S. 81, 96, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

strongly this interaction gratified the underlying psycho dynamics which controlled his thoughts and resultant conduct, his sexual addiction soon thereafter went beyond all limits of his ability to control his anti-social and self-destructive pattern of living. This addictive behavior significantly impaired Maack's ability to control his actions throughout the course of conduct alleged in both cases.

*Id.* The defendant argues that the second crime, committed while "cooperating" with the government for the first crime, actually demonstrates the depth of his problems: although he had "every conceivable reason to live as a model citizen," *id.* at 8, he engaged in repeated fraudulent behavior.

In support of his claims, the defendant presented extensive testimony by Drs. Berman and Turner as well as an expert report drafted by these physicians.[9] The report states that Mr. Maack suffers "from a primary sexual addiction, dating back to adolescence." Def. Ex. A ¶ 1. This addiction "required numerous women, driving him into behaviors involving progressive risks, which included accessing monies to fuel his addiction, thereby creating increasing desperation despite awareness of dire consequences." *Id.* The doctors also state that this addiction was "intensified" by secondary addictions to "other substances and behaviors." *Id.* ¶ 2. The report explains,

> So powerful is his active sexual addiction, that the knowledge of consequences (loss of marriage, jobs, health, deals with the government, jail and death) were not strong enough to surrender the addiction. He had to be stopped by outside intervention. This is characteristic of this addiction.

*Id.* ¶ 4.

The court will not grant the motion for a downward departure. As the court explained from the bench, assuming *arguen-*

*do* that sexual addiction is a legitimate diagnoses and that Mr. Maack is in fact such an addict, the testimony of Doctors Turner and Berman simply did not establish that Mr. Maack lacked the capacity to control his illegal, fraudulent behavior. While the doctors explained in great detail how addiction generally works and why Dr. Turner, in particular, believed that the defendant met the criteria for a diagnosis of a sexual addiction, the testimony did not adequately demonstrate a lack of volition. Dr. Turner explained that sexual addiction can manifest itself in many different ways, but she could not say, even in this case, that Mr. Maack was without the capacity to decide what course of action to take in order to satisfy his addiction. Consequently, the court finds that Mr. Maack could have striven to find legal means of acquiring the money he desired.

The court also notes that there is not a persuasive fit between the defendant's sexual problems and his thefts on the facts of this case. First, his illegal behavior predated the manifestations of at least part of his sexual addiction. In fact, Dr. Turner's testimony suggested that his illegal behavior at ICS may actually have been the source of the anxiety and stress that were the catalysts for the most extreme aspects of the defendant's sexual addiction. The court also believes that the particular crimes in this case are too attenuated from the sexual addiction. Much of the money he took from the client accounts in the first case went to items that were unconnected to sexual behavior, and the court cannot accept the argument that a general need to present an image of power and wealth "forced" him to defraud his clients. Similarly, in the second crime, Mr. Maack took large amounts of money from the Brandywine companies to finance the purchase of shares at TLE. Again, this is tangentially related to a sexual addiction, if at all.

---

9. Dr. Turner is a psychiatrist who is a certified specialist in compulsive sexual addictions, and Dr. Berman is board certified in internal medicine and is an addiction specialist. *See* Def. Sent. Mem. Ex. B, C (curriculum vitae).

In the end, the court tends to agree with Dr. Cooke, the government's expert medical witness,[10] who concluded that Mr. Maack's behavior with women, including lavish spending and excessive sexual behavior, did not rise of the level of an addiction over which he had no control. Rather, Mr. Maack wished to become a part of a lifestyle that he had always envied but could not enjoy with his own money:

> Rather than being addictive, in this examiner's opinion, after the trip to Atlanta he saw a lifestyle he had never seen before and which fit into his narcissistic needs to be seen as rich and powerful. It fit into the long-standing need he had to create a certain image to undo his feelings of inadequacy. In order for someone to be classified as someone having an addiction, there must be elements that include a high tolerance, dependence, craving, withdrawal, obsession, compulsion, secrecy, and personality change. While some of these elements may have become present from around 1994 on, it is this examiner's opinion that there was no real personality change, but that Mr. Maack found an additional means by which to portray the image of wealth, power, and influence which had always been present.

Govt. Ex. 2 at 11–12. The court believes that Mr. Maack suffered from tragic human frailties, not a significantly reduced mental capacity. Accordingly, the motion will not be granted.

*Restitution*

■] The court ordered restitution in accordance with the statutory provisions that apply to each of Mr. Maack's convictions. The Mandatory Victims Restitution Act of 1996 (MVRA), effective April 24, 1996, makes restitution mandatory for certain crimes, including fraud offenses. *See* 18 U.S.C. § 3663A(c)(1)(A)(ii). For crimes to which the MVRA applies, the court must order restitution to each victim in the full amount of that victim's losses without considering the defendant's economic circumstances. *See United States v. Edwards*, 162 F.3d 87, 89 (3d Cir.1998). In contrast, the prior restitution statute, the Victim and Witness Protection Act (VWPA), required the court to consider the defendant's economic circumstances and ability to pay. *See id.* The Third Circuit has held that it is an *ex post facto* violation to apply the MVRA retrospectively. *See id.* at 92.

In this case, different statutes apply to the two offenses. The first offense, docket number 98–201, was concluded in March 1995. Thus, it is subject to the provisions of the VWPA, under which the court may impose restitution only after considering (1) the amount of loss sustained by the victims, (2) the defendant's ability to pay, and (3) how the amount of restitution imposed relates to any loss caused by the conduct underlying the offenses at issue. *See id.; see also* 18 U.S.C. § 3663(a)(1)(B). Based on the submissions of parties and after a hearing, although restitution well in excess of $1.7 million could be ordered, the court ordered restitution in the amount of $14,309.66. Although the losses to the victims were obviously much higher than this number would indicate, Mr. Maack has no assets, some debt, and he already has significant judgments against him. However, given his educational and vocational background and obvious intelligence, Mr. Maack will have the ability to regain employment and make some repayment following his release from prison. Upon his release from prison, the defendant shall make monthly payments in an amount to be determined by the Probation Department from time to time. The court retains jurisdiction to approve or modify such amounts.

The second offense, docket number 98–578, is subject to the mandatory restitution provisions of 18 U.S.C. § 3663A. The court agrees with the findings of the stipu-

---

**10.** Dr. Cooke is a forensic psychologist. *See* Govt. Ex. 1 (curriculum vita).

lation between the parties, which state that the defendant is responsible for losses to the victims in 98–578 in the amount of $496,401.18. The court also agrees that Mr. Maack took $120,000 of the money he stole from the Brandywine Companies and invested it in the Tax Lien Exchange, entitling him to more than 14,739 shares of Tax Lien Exchange stock. Restitution was ordered according to the plea agreement and subsequent stipulation for that offense. *See* Plea Agmt. ¶ 3; Govt. Supp. Sent. Mem.

*Conclusion*

As the court finds that Mr. Maack was the recipient of more than $1 million in gross receipts, a four-level offense level increase will be imposed. The court will also deny Mr. Maack's motion for a downward departure for diminished mental capacity because his volitional capacities were not so impaired that his mental illness contributed directly to the crimes in question.