DeMOSS, Circuit Judge,
concurring in part and dissenting in part:
I.
I concur fully with the majority’s disposition of Gharbi’s Sixth Amendment claim. Judge Yeakel did not abuse his discretion in denying Gharbi’s request that Brittain serve as his co-counsel.
II.
Regarding the government’s cross-appeal, I concur with the majority’s legal conclusion that the district court may not deduct amounts used to pay off pre-exist-ing, legitimate loans from the aggregate “gross receipts.” To hold otherwise would substitute the words “net receipts” for “gross receipts.” See United States v. Breve, No. 93-03801, 1994 WL 612296, at *1 (5th Cir. Oct.18, 1994) (“[T]he district court did not commit reversible error in including the full amounts of all funds derived from the fraud as constituting ‘gross receipts’ — after all, gross is gross!”); see 5th Cir. R. 47.5.3. However, in my opinion, the majority erred in allocating all of the gross receipts to Gharbi and in instructing the district court to apply the enhancement when calculating the advisory guideline range; therefore, I respectfully dissent.
III.
As an initial matter, I disagree with the majority’s characterization of Nagy and Maryam as “straws,” and I disagree with the majority’s factual finding that there was no division of gross receipts among co-conspirators.[1] Based on my review of the record, I do not believe that these indicted co-conspirators deserve this mantle of protection — this “straw” status — that the majority has bestowed upon them.
The factual bases for Nagy’s and Mar-yam’s plea agreements stipulate that they made materially false or fraudulent statements on HUD-1 settlement statements and loan applications involving the Waterline and Demarett properties. Although the majority dismissively characterizes Nagy as “a straw, a name on a piece of paper,” the facts do not support that characterization.
After reviewing the trial transcript, I am convinced that Nagy was not a straw and that the district court should have allocated a certain amount of gross receipts to him. Nagy testified to the following facts at Gharbi’s trial: Fir Deljavan, an indicted co-conspirator who remains a fugitive, recruited Nagy to purchase the Waterline property from Gharbi.[2] Based on repre *559 sentations made by Deljavan, Nagy expected to be paid at least $25,000 in exchange for his participation in the scheme.[3] Nagy executed a power of attorney, which authorized Deljavan to act on Nagy’s behalf regarding his purchase of the Waterline property, but this power of attorney was never used.[4] On the same day, Delja-van took Nagy to Gharbi’s office, picked up a check for $10,000, cashed it, and gave the money to Nagy.[5] The $10,000 check was drawn on Gharbi’s personal account and payable to Deljavan.[6] Nagy never had any discussion with Gharbi concerning the purpose of the $10,000; Deljavan was Nagy’s sole source of information regarding the two Waterline transactions.[7]
Nagy understood that the Waterline property would be purchased in his name, and then would either be immediately sold or rented out and sold at a later date.[8] As part of the scheme, Nagy expected that the property titled in his name would eventually be sold and his personal liability on the mortgage would be extinguished from the gross receipts of the final sale.[9] Delja-van mailed the closing documents to Nagy in England, and Nagy executed those documents with the expectation that he would be paid the remaining $15,000 he was promised by Deljavan.[10] At the time he executed the closing documents related to his purchase of the Waterline property, Nagy knew that they were fraudulent.[11] Nagy signed a HUD-1 settlement statement, promissory note, and deed of trust. But for the fraudulent statements contained in these closing documents, Nagy— the borrower — would not have derived $230,802 in gross receipts from Option One Mortgage Corporation, a financial institution.[12] Shortly after Nagy executed the fraudulent closing documents, Deljavan personally met Nagy in England and paid him $15,000 cash.[13] Nagy never made any out-of-pocket payments involving the Waterline property, and he never intended to live in the property.[14] Approximately one year later, Nagy executed another power of attorney, which allowed Deljavan to act as Nagy’s agent in Gharbi’s purchase of the Waterline property from Nagy.[15] But for his fraudulent statements on the closing documents, Gharbi — the borrower— would not have derived $332,500 in gross receipts from Guardian Mortgage Services, Inc., a financial institution. From the gross receipts of Gharbi’s purchase of the Waterline property from Nagy, $247,000 was used to pay off Nagy’s old mortgage, and $87,369 was paid to Deljavan.[16] Ghar-bi did not pocket any gross receipts from his purchase of the Waterline property from Nagy, but he did pocket a significant *560 sum from Nagy’s purchase of the Waterline property from Gharbi.[17]
In my opinion, a person who is a mere straw does not do the following: (1) personally execute a fraudulent HUD-1 settlement statement, promissory note, and deed of trust; (2) receive a front-end advance and a back-end kickback of gross receipts; (3) reap the benefit of gross receipts used to extinguish personal liability on a fraudulently obtained mortgage; (4) confess to substantial participation in the fraud; (5) and then plead guilty to a felony count of wire fraud.[18] Furthermore, a cursory examination of the Waterline transactions indicates that there was a division of gross receipts among co-conspirators: Del-javan received $87,369 in gross receipts from Gharbi’s purchase of the Waterline property from Nagy, Nagy’s personal liability on a $247,000 mortgage was extinguished with gross receipts from that same purchase, and the $15,000 cash payment made by Deljavan to Nagy is traceable to gross receipts from Nagy’s purchase of the Waterline property from Gharbi. Based on these facts, I believe that Nagy derived $230,802 in gross receipts from a financial institution, and this amount should not be attributed to Gharbi.
IV.
In conspiracy cases involving the gross receipts enhancement, the district court must determine at sentencing “if the gross receipts to the defendant individually, rather than to all participants, exceeded $1,000,000.” U.S.S.G. § 2B1.1(13)(A) cmt. n.ll(A) (emphasis added); see United States v. Kohli, 110 F.3d 1475, 1477 (9th Cir.1997) (“The sentencing court must determine the amount derived from the offense by each defendant individually. It follows that in making that determination, no part of the amount found to have been derived by one defendant can be counted as having been derived by another defendant.”) (internal citation omitted); United States v. Weidner, 437 F.3d 1023, 1046 (10th Cir.2006) (same); United States v. Castellano, 349 F.3d 483, 486 (7th Cir.2003) (same). “Commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.” United States v. Holbrook, 499 F.3d 466, 468 (5th Cir.2007) (quoting Stinson v. United States, 508 U.S. 36, 38, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993)).
In my opinion, Judge Yeakel reached the right result — the enhancement does not apply to Gharbi — for the wrong reason — by reducing the aggregate “gross receipts” by the amounts used to pay off preexisting, legitimate loans. The purpose of this sentencing guideline is to enhance the punishment of the defendant who individually derives more than $1 million in gross receipts from one or more financial institutions as a result of the offense. In my view, the fraudulent conduct in this case is procuring a loan from a lender based on fraudulent statements. The “gross receipts” would be the original principal amount of the loan represented by the promissory note. The person who “derives” such gross receipts is the borrower who executes the loan application and promissory note. Based on the facts of this case, I believe it is reasonable to allocate the face value of the loans as gross receipts attributable to the borrower.
For example, when Nagy purchased the Waterline property from Gharbi, Nagy executed the fraudulent loan application, and he derived gross receipts from Option One Mortgage Corporation in the amount of *561 $230,802. Nagy derived this money from a financial institution as a result of his fraudulent conduct. In my opinion, what happened to the money after Nagy derived it from the financial institution is irrelevant. See Kohli, 110 F.3d at 1477-78 (“[T]he definition of ‘gross receipts’ encompasses funds controlled by the defendant before he compensates his cohorts.”). If we attributed $230,802 in gross receipts to Nagy, then the enhancement would not be applicable to Gharbi if the majority’s high-end allocation of $1,180,300 to Gharbi is reduced to $949,498. Similarly, but for the fraudulent statements contained in the four Demarett loan applications executed by Maryam, she would not have derived an aggregate of $351,500 in gross receipts from several financial institutions. If these gross receipts were attributed to Maryam, then Gharbi’s allocation of gross receipts would be further reduced to $597,998.
I agree with the majority’s conclusion that the $332,500 loan made to Gharbi for his purchase of the Waterline property from Nagy should be attributed to Gharbi because he was the borrower; however, I disagree with the majority’s conclusion that the $230,802 loan made to Nagy for his purchase of the Waterline property from Gharbi should also be attributed to Gharbi. In my opinion, the gross receipts should be attributed to the borrower who knowingly submitted the fraudulent loan application and derived the proceeds from the financial institution. I would affirm the district court’s refusal to apply the gross receipts enhancement under our rule that allows us to affirm for any reason supported by the record, even if not relied on by the district court. LLEH, Inc. v. Wichita County, Tex., 289 F.3d 358, 364 (5th Cir.2002).
V.
I acknowledge that other courts have advocated a “tracing” allocation method, but I do not approve of it. As stated previously, I believe that the gross receipts should be attributed to the borrower who derives funds from a financial institution as a result of the fraudulent statements made on the loan application. In my view, the fraud is consummated once the financial institution distributes the funds to the borrower. In contrast, the “tracing” allocation method allocates gross receipts based on the actual dollar amount that inured to the benefit of each co-conspirator who participated in the scheme. See United States v. Khedr, 343 F.3d 96, 101 (2d Cir.2003) (reducing gross receipts attributable to the defendant who submitted fraudulent loan applications by the amount that he distributed to his co-conspirator); see also Khohli, 110 F.3d at 1478. I have previously demonstrated that there was a division of receipts among co-conspirators, which is contrary to the position of the majority, and this division would be relevant to the “tracing” allocation method if it were used.
I believe my “borrower” allocation method is sound. However, we have previously held that a district court’s allocation of gross receipts among co-conspirators is reviewed for clear error and that we afford the district court wide latitude in making that factual determination. See United States v. Patrick, 88 Fed.Appx. 32, 34 (5th Cir.2004); see also United States v. Millar, 79 F.3d 338, 346 (2d Cir.1996) (remanding to the district court for findings on the amount of gross receipts the defendant derived “individually — not jointly— from the offense”). As an alternative to affirming based on my “borrower” allocation method, we should have remanded without instructing the district court to apply the enhancement so that it could allocate gross receipts among the various indicted co-conspirators involved in this scheme.
*562 VI.
On remand, I note that the district court may entertain the possibility of imposing a non-guideline sentence on Gharbi. See United States v. Smith, 440 F.3d 704, 707 (5th Cir.2006) (regarding appellate review of non-guideline sentences); see also Gall v. United States, — U.S. -, 128 S.Ct. 586, 169 L.Ed.2d 445, 2007 WL 4292116, *2 (Dec. 10, 2007) (“We now hold that, while the extent of the difference between a particular sentence and the recommended Guidelines range is surely relevant, courts of appeals must review all sentences— whether inside, just outside, or significantly outside the Guidelines range — under a deferential abuse-of-discretion standard.”).

. The term "straw” does not appear anywhere in the language of the gross receipts enhancement or in the guideline commentary interpreting it. According to the government’s first witness, Thomas Martin Henry, a "straw” buyer or seller means "a person that was involved in the [fraudulent] transaction ... for the purposes of hiding something.” Trial Tr. (Vol.3) 40:5-16. Henry testified that Nagy was an interested party who was not involved in an "arms-length transaction” with Gharbi regarding the Waterline property. In my opinion, this was not exculpatory testimony. Contrary to the majority, I cannot close my eyes to Nagy’s and Maryam's participation in this scheme.

. Trial Tr. (Vol.4) 13:21-25, 14:1-9, 47:15-18.

. Id. at 7:16-21.

. Id. at 14:5-9, 14:18-23.

. Id. at 17:5-7, 17:16-21, 18:17-22, 21:4-9.

. Id. at 18:17-22.

. Id. at 21:7-17, 34:15-20, 46:3-12.

. Id. at 16:22-25.

. Id. at 47:19-25.

. Id. at 23:1-20, 27:1-7.

. Id. at 24:1-5, 25:3-8, 28:7-22, 31:5-13, 32:2-5, 32:23-25, 33:6-22.

. See Gov't Ex. 2.

. Trial Tr. (Vol.4) 36:1-19.

. Id. at 34:21-25, 35:1-10, 36:20-25, 47:2-11.

. Id. at 35:11-24.

. Deljavan received a $66,369 check payable to "SBR, Inc. or Firooz Deljavan” and a second $21,000 check payable to himself as a "commission.” Both of these checks were drawn on the escrow account of attorney Allan Craig, an indicted co-conspirator.

. See Gov’t Ex. 2, Ex. 4D.

. Trial Tr. (Vol.4) 42:1-8.