**UNITED STATES of America,**

v.

**Kenneth Keith LONG, Defendant.**

**No. CR. 99–0182(PLF).**

United States District Court,
District of Columbia.

Dec. 4, 2001.

Gregg A. Maisel, Assistant U.S. Attorney, Washington, DC, for Government.

Neil H. Jaffee, Assistant Federal Public Defender, Washington, DC, for Defendant.

## OPINION

PAUL L. FRIEDMAN, District Judge.

This case came before the Court for a sentencing hearing on September 19, 2001. In a day-long hearing, the Court heard oral arguments from counsel for both parties as to the proper application of the United States Sentencing Guidelines, as well as on defendant's motion for a downward departure and the government's motion for an upward departure. In addition, the Court heard the testimony of Dr. Fred Berlin, an expert witness proffered by the defendant. Based upon the parties' sentencing memoranda and motions papers, the Presentence Investigation Report and post-hearing memorandum prepared by Supervising Probation Officer Shari L. McCoy, the testimony and arguments presented in court and the entire record in this case, the Court makes the following findings with regard to the sentencing of defendant Kenneth Keith Long.

## I. BACKGROUND

This case went to trial before a jury on a seven-count indictment, charging the defendant with four counts of interstate transportation of minors with the intent to engage in criminal sexual activity, in violation of 18 U.S.C. § 2423(a); two counts of possession of visual depictions (photographs and photographic negatives) of minors engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(4)(B); and one count of sexual exploitation of children, in violation of 18 U.S.C. § 2251(a). This last charge was dismissed during trial when the government realized that the portion of the statute on which it relied had been enacted after the events in question in this case took place. After four days of pretrial hearings and an eight-week trial, the jury convicted the defendant on two counts of interstate transportation of minors for the purpose of sexual activity and two counts of possession of photographs and photographic negatives of minors engaged in sexually explicit conduct. The jury acquitted the defendant of one count of interstate transportation and was unable to reach a verdict on another, which count later was dismissed. The Court now must determine the appropriate application of the Sentencing Guidelines to defendant Long for the four charges of which he was convicted by the jury.

## II. APPLICATION OF THE SENTENCING GUIDELINES

### A. Applicable Provisions of the Sentencing Guidelines

Counts One through Four charged violations of 18 U.S.C. § 2423(a), interstate transportation of minors with the intent to engage in criminal sexual activity, the guideline for which is found in Section

2G1.1 of the Sentencing Guidelines.[1] Section 2G1.1(c)(1), however, directs that "[i]f the offense involved causing, transporting, permitting, or offering or seeking by notice or advertisement, a person less than 18 years of age to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct," the Court should apply Section 2G2.1. Because the Court agrees with the government that the (c)(1) cross reference applies here, Section 2G2.1 is the controlling guideline provision. *See infra*, Parts II.D(1)-(4).

Counts Six and Seven charged violations of 18 U.S.C. § 2252(a)(4)(B), possession of visual depictions (photographs and photographic negatives) of minors engaged in sexually explicit conduct, the guideline for which is found in Section 2G2.4 of the Guidelines. The cross reference at Section 2G2.4(c)(1) also directs the Court to apply Section 2G2.1 "[i]f the offense involved causing, transporting, permitting, or offering or soliciting by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct."[2] Thus, the controlling guideline for all of the offenses on which defendant was convicted is Section 2G2.1. That guideline provides for a base offense level of 27.

### B. Grouping

Although the Probation Office did not group the charges according to victim in its initial Presentence Investigation Report ("PSI"), all parties at the hearing agreed to restructure the grouping so that all charges with respect to each victim would be considered a separate group for sentencing purposes. The Court adopts the revised guideline structure provided as "Scenario B" in the Probation Office's post-hearing memorandum of October 18, 2001 ("Probation Office Memo") and will consider the charges in five groups, one for each victim involved in the offenses of conviction.[3]

### C. Exclusion of Conduct Relating to Victim TL

■ The government urges the Court to consider conduct involving TL, a person who was depicted in sexually explicit photographs that were found in defendant's possession. *See* Government's Sentencing Memorandum and Motion for Upward Departure at 17–19 ("Government Memo"); *see also* PSI at 17–18. Although the photographs of TL were not separately considered by the jury at trial, they were in the same packet as several photographs of other victims that formed the basis for defendant's convictions on Counts Six and Seven of the indictment and they were introduced in evidence. The government argues that there is more than enough circumstantial evidence to conclude by a preponderance of the evidence that TL was a minor at the time the photographs were taken, and he was depicted engaging in conduct similar to defendant's criminal conduct with other victims. The government therefore argues for inclusion of conduct related to TL as conduct relevant to the offenses of conviction under Section 1B1.3(a)(1) of the Sentencing Guidelines.

Defendant objects to any consideration of conduct involving TL, arguing that the

---

1. For the reasons set forth below, the Court will consider the conduct charged in Count One of the Superseding Indictment despite the fact that defendant was acquitted on this count. *See infra*, Part II.D(2)(a).

2. The only difference between this cross-reference and the cross-reference in Section 2G1.1

is that the cross-reference in Section 2G2.1 does not itself define the term "minor," but Application Note 1 limits its application to persons under 18.

3. The Court will not consider conduct relating to victim TL. *See infra*, Part II.C.

conduct is not relevant and that the evidence at trial did not establish by a preponderance of the evidence that TL was a minor. *See* Defendant's Sentencing Memorandum ("Def's Memo") at 15–17. Defendant also asserts that even if possession of the photographs of TL is relevant, the cross-reference contained in Section 2G2.4(c)(1) should not be applied, since there is no direct evidence that defendant induced or transported TL to engage in sexually explicit conduct for the purpose of producing photographs of that conduct. In response, the government contends that defendant's possession of the photographs of TL is relevant conduct because it occurred "during the commission of the offense of conviction." *See* Government's Memo at 18, citing U.S.S.G. § 1B1 .3(a)(1).

The Court concludes that conduct relating to TL should not be considered for purposes of sentencing. At trial, the jury was asked to consider six specific photographs in connection with Count Six and five specific photographic negatives in connection with Count Seven. In each case, the jury was asked to indicate on the jury verdict form whether it had unanimously found that the defendant possessed the particular photograph or photographic negative and whether it had unanimously found that it depicted a minor engaging in sexually explicit conduct. None of the photographs of TL was considered by the jury in this context, and there therefore is no finding by the jury and no unanimous jury verdict as to whether TL was a minor at the time the photographs of him were taken. While the Court need only decide by a preponderance of the evidence whether TL was a minor, the Court chooses to limit itself in this instance to the matters as to which the jury reached a unanimous verdict beyond a reasonable doubt. Without reaching a decision on the sufficiency of the evidence or the relevance of defendant's conduct involving TL, the Court finds it unnecessary to consider this conduct in setting a fair, effective and appropriate sentence under the Sentencing Guidelines.

### D. Offense Level Calculations

The relevant Sentencing Guidelines provide that if the offense or offenses of conviction involve more than one victim, Chapter Three, Part D (Multiple Counts) shall apply. *See* U.S.S.G. §§ 2G1.1(d)(1), 2G2.1(c)(1). Furthermore, each minor exploited is to be treated as a separate victim for these purposes, U.S.S.G. § 2G2.1, Application Note 2, and all-counts involving that same victim and two or more acts or transactions constituting a common scheme or plan are to be grouped. U.S.S.G. § 3D1.2(b). By contrast, multiple counts involving separate victims are not to be grouped together under Section 3D1.2. *See* U.S.S.G. § 2G2.1, Application Note 2. Rather, a combined offense level is to be determined by taking the highest offense level applicable to a particular group—in this case, multiple charges involving the same victim—and increasing that offense level by a certain number of units under Section 3D1.4 of the Guidelines, and then increasing the offense level as indicated. *See* U.S.S.G. §§ 3D1.4, 2G2.1, Application Note 2.

#### 1. Group One: JEG

##### a. Base Offense Level

■ Defendant was convicted on Count Two of violating 18 U.S.C. § 2423(a), interstate transportation of a minor with intent to engage in criminal sexual activity, with respect to victim JEG. The cross reference in Section 2G1.1(c)(1) therefore will apply if defendant's transportation of JEG to engage in criminal sexual activity "involved" causing or permitting sexual conduct "for the purpose of" producing photo-

graphs.[4] While none of the photographs that formed the basis of defendant's convictions on Counts Six and Seven were photographs of JEG, based on the evidence introduced at trial the Court finds that the cross reference does apply.

Defendant argues preliminarily that the Court cannot apply the cross reference without proof of supporting facts "beyond a reasonable doubt." While the defendant recognizes that the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), does not directly apply to guideline enhancements but applies only where the finding of a particular fact increases the penalty above the prescribed statutory maximum, *see id.* at 490, 120 S.Ct. 2348; *United States v. Fields*, 251 F.3d 1041, 1043–44 (D.C.Cir.2001) (*"Fields II"*), defendant nevertheless asks the Court to apply the reasoning of *Apprendi* to the Section 2G1.1(c)(1) cross reference because the application of the cross reference "significantly increase(s) the defendant's punishment." Def's Memo at 6. The Court rejects the invitation to extend *Apprendi* in this manner. *See United States v. Webb*, 255 F.3d 890, 897 (D.C.Cir.2001); *United States v. Fields*, 251 F.3d 1041, 1043–44 (D.C.Cir.2001).

Defendant further argues that even if *Apprendi* does not apply the Court should require clear and convincing evidence to justify applying the cross reference in Section 2G1.1(c)(1) of the Guidelines (and presumably its analogue at Section 2G2.4(c)(1), *see supra*, Parts II.D(3)-(4)). *See* Def's Memo at 6–7. The increase under Section 2G2.1 of the Guidelines would be from base offense level 19 to offense level 27, an eight level increase;

the increase under Section 2G2.4 would be from base offense level 15 to offense level 27, a twelve level increase. If the Court considers the aggregated effect of applying the cross reference to all counts, as defendant suggests, the combined increase is not so significant as to require a clear and convincing standard of proof. Application of the cross references in Sections 2G1.1(c)(1) and 2G2.4(c)(1) of the Guidelines to all counts (as suggested in the PSI) would increase defendant's total offense level from level 29 to offense level 37, an increase of eight levels. *See* U.S.S.G. §§ 2G1.1(c)(1), 2G2.4(c)(1) and 3D1.4 and Ch. 5, Pt. A.

Defendant cites several cases that purport to stand for the proposition that an eight-level increase in offense level is significant enough to require proof by clear and convincing evidence rather than by a preponderance of the evidence, the normal standard for sentencing adjustments. The only case that is arguably relevant, however, is the Third Circuit's decision in *United States v. Kikumura*, 918 F.2d 1084, 1100–01 (3rd Cir.1990). That pre-*Apprendi* case is clearly an outlander and may have no continuing viability in view of the Supreme Court's discussion of *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), in *Apprendi*. In any case, unlike the 22–level enhancement at issue in *Kikumura*, the increase imposed here is only eight levels, thus not presenting an "exceptional case" so drastic as to require proof by clear and convincing evidence. *See United States v. Townley*, 929 F.2d 365, 370 (8th Cir.1991). Indeed, *Kikumura* itself supports this conclusion: "[I]f proof by a mere preponderance is sufficient to justify a two-level increase for

---

**4.** The cross reference always requires that the conduct involve a minor, or a person under the age of 18. *See supra*, note 2. The parties do not dispute that JEG was under 18 at all times relevant to the conduct at issue. In fact, he was under the age of 16 and was still 15 years old at the time of the trial. *See infra*, Part II.D(1)(b).

willfully impeding an investigation ... then proof by that identical standard is also appropriate in order to justify, for example, a four-level increase for organizing an offense ...; or a six-level increase for unlawfully receiving explosives that one knows to be stolen ...; or probably even a ten-level increase for distributing those explosives to a fugitive from justice ...." *United States v. Kikumura,* 918 F.2d at 1100. Proof by a preponderance of the evidence is all that is required in this case.

■ Turning now to the evidence, JEG testified at trial that defendant transported him on numerous occasions from Virginia to defendant's home in Maryland and, later, to his new house in the District of Columbia, where JEG masturbated at defendant's request and had anal sex with him and where defendant gave JEG oral sex. JEG testified that he visited defendant's house frequently over a two year period. On one occasion, while at defendant's house in the District of Columbia, defendant took a photograph of JEG's aroused penis after defendant had provided a pornographic video for JEG to watch and had instructed JEG to masturbate. *See* Tr. at 1600–01. JEG also testified that defendant asked to take photographs or videotapes of JEG on other occasions and that defendant always kept a video camera in his room. *See* Tr. at 1600–03. While no photograph of JEG was recovered from searches of defendant's home that would confirm these allegations, the Court finds JEG's testimony credible and consistent with defendant's *modus operandi* of photographing the victims of his sexual abuse, as established through other testimony and evidence. Particularly in light of the guideline's instruction that Section 2G1.1(c) should be construed broadly, *see* U.S.S.G. § 2G1.1, Application Note 9, the Court finds that defendant's effort to cause JEG to become sexually aroused and

then photograph JEG during arousal constitutes inducement of sexual conduct "for the purpose of" producing a visual depiction of that conduct. *See* U.S.S.G. § 2G1.1(c)(1).

The next question is whether the offense of conviction—transporting JEG with the intent to engage in criminal sexual activity—"involved" the above-described incident (or any similar incidents) in which defendant induced JEG's sexually explicit conduct for the purpose of producing visual depictions thereof. *See* § 2G1.1(c)(1). On this question, the Court credits the testimony of JEG with respect to the number of times he went with the defendant to Maryland or the District of Columbia for sex and what happened there. The Court simply finds it implausible that defendant's repeated transportation of JEG over the course of two years, which formed the basis for the jury's conviction on Count Two, did not involve his inducement of sexual conduct for the purpose of photographing that conduct. As noted, this was defendant's *modus operandi* with numerous victims over the years, including several who testified at trial—JLG, JS, JWG and HC among them.

Defendant attempts to avoid application of Section 2G1.1(c)(1) by asserting that the cross reference incorporates only conduct that was not just "involved" but actually *included* in the offense. *See* Def's Memo at 8–9. Section 1B1.1 defines "the offense" to mean both the offense of conviction "and all relevant conduct ... unless a different meaning is specified or is otherwise clear from the context." U.S.S.G. § 1B1.1, Application Note 1(1). Thus, under defendant's argument, the inducement of sexual conduct for the purpose of photographing that conduct must be *included in* either the offense of conviction (here, illegal transportation of JEG) or the "relevant conduct" to the offense of conviction. *See*

U.S.S.G. § 1B1.3. While defendant may be correct that his inducement of sexual conduct for the purpose of photographing that conduct was not included in the offense of conviction, he is wrong that it is not included in the relevant conduct.

Under Section 1B1.3 of the Guidelines, relevant conduct includes "all acts and omissions committed . . . by the defendant . . . that occurred *during* the commission of the offense of conviction [or] *in preparation for* that offense." U.S.S.G. § 1B1.3(a)(1) (emphasis added). Defendant argues that his inducement of JEG's sexual conduct for purposes of photographing that conduct was not "during" or "in preparation for" his transportation of JEG. The Court disagrees. As the government notes, the weight of the evidence is that defendant's attempts to produce sexually explicit photographs of JEG almost certainly occurred during the approximately two years in which the defendant was transporting JEG to the District of Columbia with the intent to commit sexual acts. JEG lived with the defendant for only two months, and there is no evidence to indicate that the photographing of JEG took place only during that period—a brief period near the end of the 26–month period of sexual abuse of JEG. JEG's uncontradicted testimony is to the contrary. The Court finds by a preponderance of the evidence that at least some of defendant's attempts at sexually explicit photographing of JEG were made "during the commission of the offense of conviction." The conduct therefore is relevant conduct under Section 1B1.3(a)(1)(A) and may be considered as part of the offense for purposes of the cross reference, whether or not the

Court accepts defendant's interpretation of "involved" to mean "included." The cross reference in Section 2G1.1(c)(1) is triggered and Section 2G2.1 applies to Count Two, resulting in a base offense level of 27.

### b. Victim–Related Adjustments

 Because the evidence at trial was undisputed that JEG was under the age of 16 at the time of the conduct underlying Count Two, an increase of two levels applies under Section 2G2.1(b)(1)(B).[5] The Court also adopts the two-level increase under Section 2G2.1(b)(2) because JEG was "in the custody, care, or supervisory control of the defendant." The evidence at trial was that defendant frequently picked JEG up from his mother's home for various trips and activities, during which time JEG was in the supervisory control of the defendant. In addition, defendant invited JEG to live with him, using the disadvantaged situation of JEG's mother, NG, to convince her that JEG would be better off at the defendant's home than with his mother. Thus, JEG was in the "care, custody [and] supervisory control" of defendant on numerous occasions and for extended periods of time, while the offenses were being committed, thus warranting a two-level increase under Section 2G2.1(b)(2) of the Sentencing Guidelines.

 The government also urges application of an additional two-level upward adjustment under Section 3A1.1(b)(1) based on defendant's awareness that JEG was an unusually "vulnerable victim."[6] Defendant objects to this adjustment on the ground that JEG was not "unusually vulnerable" by virtue of being a special edu-

---

5. Section 2G2.1(b)(1) provides: "If the offense involved a victim who had (A) not attained the age of twelve years, increase by 4 levels; or (B) attained the age of twelve years but not attained the age of sixteen years, increase by 2 levels."

6. Section 3A1.1(b)(1) provides: "If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels."

cation student. *See* Def's Memo at 10–11. The Court disagrees. JEG was an emotionally troubled special education student whose emotional and intellectual weaknesses made him particularly susceptible to exploitation by defendant, enabling defendant to assume the role of mentor and elicit JEG's trust and dependence, leading ultimately to his severe exploitation. Based on the evidence at trial, the Court finds that JEG was unusually vulnerable, not only because of his age—already accounted for under Section 2G2.1(b)(1)(B)—but also because he was an emotionally troubled special education student whose vulnerabilities were well beyond those inherent in all young victims. *See United States v. Archdale*, 229 F.3d 861, 869–70 (9th Cir.2000); *United States v. Romero*, 189 F.3d 576, 590 (7th Cir.1999)

In the case of Group One, relating to Count Two and JEG, the base offense level is 27. There is an upward adjustment of two levels because of JEG's age under Section 2G2.1(b)(1)(B); two levels under Section 2G2.1(b)(2) because JEG was in the care, custody or supervisory control of the defendant; and two levels because JEG was an unusually vulnerable victim under Section 3A1.1(b)(1). The adjusted offense level for Group One is 33.

### 2. *Group Two: JLG*

#### a. Base Offense Level

Defendant was charged with two offenses involving JLG. He was acquitted by the jury on Count One (interstate transportation of a minor with intent to engage in criminal sexual activity). Photographs of JLG were among those included in Count Six, and defendant was convicted on that count (possession of materials depicting a minor engaged in sexually explicit conduct). Defendant argues that only the conduct underlying the count on which he was convicted should be considered for purposes of sentencing. The government

responds that the acquitted conduct is "relevant conduct" under Section 1B1.3(a)(1) of the Sentencing Guidelines and should be considered by the Court. The Court agrees with the government and will consider the acquitted conduct in the offense level calculation for Group Two.

The D.C. Circuit has held that acquitted conduct may be considered "relevant conduct" under the Guidelines so long as the government has proved that the defendant engaged in the conduct by a preponderance of the evidence. *See United States v. Boney*, 977 F.2d 624, 635–36 (D.C.Cir.1992). In this case, the government has more than met that burden. It was apparent to the Court at trial that the only reason the jury could have acquitted defendant of illegally transporting JLG to the District of Columbia with the intent to engage in criminal sexual activity while JLG was under the age of 16 was JLG's confusion at trial as to his age at the time of the conduct. He was not the least bit confused, however, about the many times he was transported by defendant to the District of Columbia and for what purpose or about what happened in the District of Columbia on those occasions, and he was a very credible witness. No reasonable jury could have failed to find on the basis of the evidence presented that the defendant transported JLG from Virginia to the District of Columbia for the purpose of engaging in criminal sexual activity.

Furthermore, while the jury may have been confused about JLG's age, the Court was not. The testimony of JLG's mother, NG, confirms that several of the trips to defendant's house in the District of Columbia (and, by reasonable inference, the sexual conduct that occurred during those visits) necessarily took place before JLG's sixteenth birthday on September 7, 1997.

NG was able to place the trips to defendant's new house in the District at a time just after she, her sons and defendant returned from a trip to Puerto Rico, at the Christmas/New Year's season, while she was pregnant and before she gave birth to her fourth child in May of 1997. *See* Tr. at 1267, 1432–33, 1437. As the Court stated in denying defendant's motion for judgment of acquittal on Count One at trial, NG's testimony rested on her memory of when she was pregnant, which is "about as great [a calendar] as you can get." Tr. at 3915–16. The Court thus finds that JLG's age (under 16) at the time of the offense conduct (and all of the other elements of Count One) has been proved by a preponderance of the evidence.

The Court next finds that the conduct underlying Count One involving JLG is relevant to Count Two, the interstate transportation of JEG, because it was committed "during" the offense of conviction. *See* U.S.S.G. § 1B1.3(a)(1). At trial NG testified that the defendant transported both JLG and JEG from their home in Virginia to defendant's new house in the District of Columbia on multiple occasions in early 1997. *See* Tr. at 1265–67, 1432–33, 1437. JLG reported numerous incidents of sexual activity with the defendant during these visits. *See* Tr. at 319–20. Based on the evidence that defendant transported JLG and JEG, both together and separately, from Virginia to the District of Columbia on several occasions and that defendant engaged in sexual activity with each of them at some time during these visits, *see* Tr. at 319–320, 1600–01, the Court finds it more likely than not that defendant transported JLG for the purpose of engaging in sexual activity "during" his transportation of JEG for the same purpose. As the government explains, this finding need not rest on specific evidence that defendant engaged in illegal sexual activity with JLG during any particular instance of

transporting both JLG and JEG. Instead, the Court need only find that "one of [defendant's] dominant motivations was to engage in such illegal sexual activity, even if that intent may not have been realized on a given trip." Government Memo at 14, note 9. The acquitted conduct involving JLG thus is relevant conduct under Section 1B1.3(a)(1) because it occurred "during" the conduct underlying the Count Two conviction.

b. Calculation of Offense Level

Once the acquitted conduct of Count One is included in Group Two, the cross reference at Section 2G1.1(c)(1) of the Sentencing Guidelines is triggered because the conduct underlying Count One "involved causing, transporting [or] permitting . . . a person less than 18 years of age to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct." U.S.S.G. § 2G1.1(c)(1). Specifically, JLG testified that defendant transported him to defendant's home in the District of Columbia and instructed JLG to perform nude dancing and to pose partially naked so that defendant could photograph or videotape JLG in those positions. *See* Tr. at 272–73, 502–03. The Court found JLG's testimony at trial to be credible and consistent with defendant's *modus operandi* as established with respect to other victims. The cross reference at Section 2G1.1(c)(1) therefore applies and makes it appropriate to apply Section 2G2.1 of the Guidelines, which sets a base offense level of 27.

Furthermore, because the Court has found by a preponderance of the evidence that JLG was under the age of 16 at the time of the conduct underlying Count One, an increase of two levels is warranted under Section 2G2.1(b)(1)(B) of the Guidelines. The Court also adopts the two-level increase suggested in the PSI under Sec-

tion 2G2.1(b)(2) on the ground that JLG was "in the custody, care, or supervisory control of the defendant." Finally, for the reasons already stated with respect to JEG, the Court will apply a two-level upward adjustment under Section 3A1.1(b)(1) because JLG, like his younger brother JEG, was an unusually "vulnerable victim." These adjustments result in a total adjusted offense level for Group Two of 33.

### 3. Group Three: JS

Defendant was convicted of three offenses involving JS. Count Four of the indictment charged him with the interstate transportation of JS from Puerto Rico into the District of Columbia with the intent to engage in criminal sexual activity and the jury found him guilty of this offense. He also was convicted on two counts of possessing visual depictions of minors engaged in sexually explicit conduct, one involving photographs (Count Six) and the other involving photographic negatives (Count Seven). Images of JS were contained in both groups. For the reasons previously discussed, all matters involving JS will be treated as a single group.

Defendant makes many of the same arguments with respect to JS that the Court already has rejected in connection with JEG and JLG. First, defendant suggests that the cross reference in Section 2G1.1(c)(1) should not apply to the Count Four conviction because defendant was not charged with or convicted of any specific act of "causing, transporting [or] permitting" JS to engage in sexually explicit conduct for the purpose of photographing that

conduct. *See* Def's Memo at 13–14. Defendant argues that without specific testimony connecting defendant's possession of sexually explicit photographs of JS with a particular act of illegally transporting JS, the cross reference does not apply. As stated above with respect to JEG, however, the Court need not find any such direct connection. It is sufficient that defendant's illegal transportation of JS from Puerto Rico to the District of Columbia on two separate occasions more likely than not involved defendant's intent to take sexually explicit photographs of JS. Based on JS's credible testimony at trial, the Court finds that defendant's illegal transportation of JS to the District of Columbia involved at least one occasion on which the defendant induced JS to engage in sexually explicit conduct for the purpose of videotaping that conduct, and that the defendant in fact videotaped JS masturbating in defendant's bedroom in defendant's home in the District of Columbia. *See* Tr. at 886–87.[7] The cross reference at Section 2G2.4(c)(1) therefore applies to Count Four and directs the Court to apply Section 2G2.1. That section sets a base offense level of 27.[8]

The Court also finds it more likely than not that the conduct underlying Count Four occurred while JS was in defendant's "custody, care or supervisory control," thus warranting an additional two-level increase under Section 2G2.1(b)(2) of the Guidelines. On two occasions in 1997 and 1998, defendant transported JS from Puer-

7. Defendant's videotaping of JS masturbating in the District of Columbia is consistent with defendant's *modus operandi*. For example, HC testified that the defendant asked to videotape him while masturbating (and did so) while they were in the presence of JS at a house in Puerto Rico. The sexually explicit photographs of JS taken by defendant in a hotel room and a car in Puerto Rico also corroborate JS's testimony that defendant videotaped him in the District of Columbia engaged in sexually explicit conduct.

8. Relevant conduct as defined under Section 1B1.3 is clearly within the scope of the Section 2G2.4(c)(1) cross reference. *See supra,* Part II.D(1)(a) (discussing analogous cross reference at Section 2G1.1(c)(1)).

to Rico to defendant's home in the District of Columbia and JS stayed for approximately two weeks on each occasion. During these visits, defendant engaged in unlawful sexual activity with JS numerous times. Defendant does not object to this increase or to the two-level increase required under Section 2G2.1(b)(1) for JS's age at the time of the offense (under 16). *See* Def's Memo at 14. In calculating the adjusted offense level, the Court therefore applies a base offense level of 27; it then adds four levels for the specific offense characteristics of JS's age and custodial status, for a total adjusted offense level of 31. *See* U.S.S.G. §§ 2G1.1(c)(1); 2G2.4(c)(1); 2G2.1(b)(1) & (b)(2).

#### 4. *Groups Four and Five: HC and JWG*

With respect to both HC and JWG, defendant was convicted of possessing one or more sexually explicit negatives of each in violation of 18 U.S.C. Section 2252(a)(4). Section 2G2.4 of the Sentencing Guidelines therefore is the applicable guideline. If the charged offense "involved causing, transporting [or] permitting . . . a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct," then the cross reference in Section 2G2.4 requires the application of Section 2G2.1 of the Guidelines. Defendant was not specifically charged with or convicted of transporting HC or JWG with the intent to engage in criminal sexual activity or for the purpose of taking explicit photographs. The Court nevertheless may consider uncharged conduct as relevant conduct under the Guidelines, and *any* act of causing, transporting or permitting a minor to engage in sexual conduct for the purpose of producing photographs will trigger the cross reference. *See* U.S.S.G. §§ 1B1.3(a), 2G2.4(c)(1); *supra*, Part II.D1(a).

Based on defendant's *modus operandi* as demonstrated with respect to other victims, the Court finds it more likely than not that defendant did not merely possess the images of HC and JWG, but also caused, transported or permitted HC and JWG to engage in sexually explicit activity for the purpose of taking photographs of that conduct. *See* U.S.S.G. § 2G2.4(c)(1). In fact, JWG testified at trial that defendant drove him to the beach in his car and that defendant took a photograph of his erect penis in the parking lot at the beach. HC testified that he put his penis in defendant's mouth a number of times and that defendant took photographs of him with his penis exposed. These facts trigger application of the cross reference at Section 2G2.4(c)(1), which sets a base offense level of 27 for each group. The Court then adds a two-level increase based on the victims' ages, both of whom were under 16, a fact that is not disputed by defendant. *See* Defendant's Memo at 17. The total offense level for each of these two groups therefore is 29.

#### E. *Multiple Count Adjustment and Total Offense Level*

Having now calculated the total offense level for each of the five groups, the Court determines the combined offense level under Section 3D1.4 of the Guidelines by first taking the highest offense level for any one group—in this case 33 for Group One or Group Two—counting it as one Unit, and then applying additional Units for each of the other groups depending on its seriousness. *See* U.S.S.G. § 3D1.4. In this case, each group receives one Unit under the Guidelines, since none is more than four offense levels from the highest adjusted offense level, for a total of 5 Units. Based on the greatest adjusted offense level and a four-level increase for the number of Units, the total offense level is 37. *See id.;* Probation Office Memo, ¶¶ 78–81.

### F. Criminal History Category

■ The PSI assigns defendant Long two criminal history points, including one for a prior conviction of petit theft in Florida in 1990. The defendant objects to inclusion of the petit theft conviction, arguing that the offense should be excluded because the charge of petit theft is similar to the type of offense normally excluded from criminal history calculations under Section 4A1.2 of the Guidelines. The Court disagrees.

Under Section 4A1.2 of the Sentencing Guidelines, sentences for misdemeanors and petty offenses are counted, except for an enumerated list of offenses and those "similar to them." U.S.S.G. § 4A1.2(c)(1). For these, the offense may not be considered unless the sentence imposed was at least one year of probation or thirty days of imprisonment, or the prior offense was similar to the instant offense. *Id.* The offense of petit theft is not specifically excluded from consideration, but defendant argues that it is "similar to" the enumerated offense of "insufficient funds check." If defendant is correct that his petit theft conviction is "similar to" a charge of insufficient funds check, it should not be considered since the sentence imposed was less than one year of probation or thirty days of imprisonment. *See* U.S.S.G. §§ 4A1.2(c)(1)(A) and (1)(B). The question turns on whether petit theft is "similar to" this specifically excluded offense.

The Court finds that petit theft is not similar to an insufficient funds check and therefore should be counted. The Commentary to Section 4A1.2 of the Guidelines speaks directly to this question, stating clearly that " 'Insufficient funds check,' as used in § 4A1.2(c)(1), does not include any conviction establishing that the defendant used a false name or non-existent account." U.S.S.G. § 4A1.2, Application Note 13. As the government notes, defendant's petit theft offense involved his signing a name other than his own to a false return slip, Government Memo at 20–21— falling squarely within the Guidelines' explanation of what may not properly be excluded under Section 4A1.2(c)(1).

Based on defendant's prior convictions for solicitation for purposes of prostitution and petit theft, the total number of criminal history points is two. According to the sentencing table at U.S.S.G. Chapter 5, Part A, two criminal history points place defendant in Criminal History Category II. Based on a total offense level of 37 and a Criminal History Category of II, the guideline range for imprisonment would be 235 to 293 months.

### III. DEPARTURES FROM THE GUIDELINES

#### A. Defendant's Motion for Downward Departure

■ Defendant has moved for a downward departure under Section 5K2.13 of the Sentencing Guidelines, on the ground that he committed the instant offenses while suffering from "significantly reduced mental capacity." [9] Specifically, defendant

---

9. Section 5K2.13 reads:
 A sentence below the applicable guideline range may be warranted if the defendant committed the offense while suffering from a significantly reduced mental capacity. However, the court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or serious threat of violence; or (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public. If a departure is warranted, the extent of the departure should reflect the extent to

claims that he suffers from a sexual disorder that prevented him from understanding and controlling his actions with respect to his victims. As in all downward departure motions, the burden is on the defendant to demonstrate his entitlement to the departure by a preponderance of the evidence. *See* U.S.S.G. § 6A1.3, Commentary; *United States v. Adu,* 82 F.3d 119, 123–24 (6th Cir.1996); *United States v. Alberto–Genao,* 28 F.Supp.2d 658, 663 (D.D.C.1998).

Under Section 5K2.13 of the Guidelines, in some cases the Court may impose a sentence below the applicable guideline imprisonment range if the defendant committed the offense while suffering from a "significantly reduced mental capacity."[10] Defendant argues that he suffers from a sexual disorder that rendered him unable to appreciate fully the consequences of his behavior or control his actions toward his victims. *See* Def's Memo at 25–26. In support of this argument, defendant presented the written and oral testimony of Dr. Fred S. Berlin, an expert in sexual disorders, who gave his professional opinion that "as a consequence of his sexual disorder, Mr. Long failed to fully appreciate the degree of harm that his actions could cause. He seemed most specifically to lack appreciation of the damage that could ensue as a consequence of his failure to maintain professional boundaries . . . ." Letter from Dr. Fred Berlin to defense counsel Neil Jaffee of August 14, 2001, at 2 ("Berlin Report"). In his testimony before the Court, Dr. Berlin stated further that

the "cornerstone" of defendant's disorder was the recurrence of intense, erotically arousing urges and fantasies concerning male adolescents. Dr. Berlin explained that unlike most people, many "ephebophiles"—those who are sexually attracted to adolescents—experience these sexual urges as central in their thoughts and difficult to resist, causing distorted thinking that includes rationalizations, denial and minimization. *See* Berlin Report at 1.[11] In Dr. Berlin's opinion, defendant suffered from a "significantly reduced mental capacity, both cognitively and volitionally," as a result of his sexual disorder. *See id.* at 3. Defendant argues that for these reasons the Court should depart downward from the range of imprisonment set by the Guidelines.

A Section 5K2.13 departure may be warranted only if the defendant committed the offense "while suffering from a significantly reduced mental capacity," U.S.S.G. § 5K2.13, which is defined as meaning that the defendant had a significantly impaired ability either (a) to understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason, or (b) to control behavior that the defendant knows is wrongful. U.S.S.G. § 5K2.13, Application Note 1. The Court concludes that defendant satisfies neither prong of this definition.

▮ The Court finds that Mr. Long's disorder did not significantly impair his ability to "understand the wrongfulness" of his actions or to exercise the power of

---

which the reduced mental capacity contributed to the commission of the offense.

**10.** Even where diminished capacity is proved, a court may not depart if any of three specific factors set forth as exceptions in Section 5K2.13 is present. *See* U.S.S.G. § 5K2.13.

**11.** Dr. Berlin officially diagnosed defendant Long as suffering from a "paraphilic (sexual

deviation) disorder not otherwise specified," *see* Berlin Report at 2 (citing to the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (4th ed.1994), § 302.70), and described the above characteristics as true of both ephebophiles generally and Mr. Long specifically. *See id.* at 2–3.

reason. While defendant may have suffered from extensive cognitive distortions and failed to "fully appreciate the consequences" of his actions, Berlin Report at 2, such conditions do not fall within the intended scope of Section 5K2.13. In order for a psychological or behavioral disorder to serve as the basis for departure, "there must be an accompanying inability to reason." *United States v. Edwards*, 98 F.3d 1364, 1371 (D.C.Cir.1996). *See also United States v. Cantu*, 12 F.3d 1506, 1512–13 (9th Cir.1993) (ordinary use of the term "reduced mental capacity" refers to "a lack of full intellectual functioning .... [It] comprehends both organic dysfunction and behavioral disturbances that impair the formation of reasoned judgments."). Diminished capacity has been found where a defendant was "functioning at the borderline mental defective level of intelligence and ... suffering some degree of organic brain dysfunction," *United States v. Chambers*, 885 F.Supp. 12, 14 (D.D.C.1995), or where he had suffered a "psychotic break with reality" and was "unable to grasp ordinary concepts." *United States v. Royal*, 902 F.Supp. 268, 271–72 (D.D.C.1995).

By contrast, evidence of extensive planning and sound judgment has been found to severely undermine a claim of diminished capacity. *See United States v. Sammoury*, 74 F.3d 1341 (D.C.Cir.1996). In *Sammoury*, the defendant asserted that she suffered from "battered women's syndrome" and that the fear and anxiety caused by her abuse had "diminished her ability to make sound judgments," thus contributing to her crime of bank fraud. 74 F.3d at 1345–46. In upholding the district court's decision not to depart downward, the court of appeals noted that defendant's crime was a long-range, calculated enterprise requiring extensive planning on her part; it observed that her mental capacity "did not keep her from exercising sound financial judgment

when it came to her own finances." *Id.* at 1346. *See also United States v. Goossens*, 84 F.3d 697, 701 (4th Cir.1996) (defendant who "displayed considerable mental agility in his professional and personal affairs, both legal and illicit," not eligible for a diminished capacity departure); *United States v. Hamilton*, 949 F.2d 190 (6th Cir.1991) (defendant who "was able to absorb information in the usual way and to exercise the power of reason" was not suffering from diminished mental capacity).

In this case, the Court finds that the cognitive distortions caused by defendant Long's sexual disorder did not render him unable to absorb information or make reasoned judgments. The rationalizations, minimizations and denial described by Dr. Berlin may mean that the defendant did not see the situation clearly, or "fully appreciate" the impact of his abuse of the victims. Berlin Report at 2. It is clear, however, that defendant Long can and did grasp ordinary concepts—in fact, he displayed great "mental agility" in acting as reverend to an entire congregation, substitute teaching in schools and running a funeral home. Throughout the time of the offenses, defendant Long was able to absorb and process information in the usual way. Even Dr. Berlin testified that the defendant knew that his conduct toward his victims was wrong in the eyes of society and the law. Defendant exercised sound judgment in numerous facets of his life. Indeed, he was both deliberate and persistent in accomplishing his criminal acts—repeatedly seeking out new groups of vulnerable teens to "mentor" and manipulating their families' weaknesses to ensure the victims' dependence on him. In light of the evidence, the Court cannot find that the defendant suffered from the kind of diminished cognitive capacity contemplated by Section 5K2.13. He both under-

stood the wrongfulness of his behavior and was able to exercise and did exercise the power of reason.

The second prong of Section 5K2.13 permits a downward departure if defendant's disorder caused him to be unable to control his behavior. It is designed to benefit a defendant who cognitively is able to understand the wrongfulness of his actions but somehow is unable "to control behavior that the defendant knows is wrongful." U.S.S.G. § 5K2.13, Application Note 1. In his testimony at the sentencing hearing on September 19, 2001, Dr. Berlin explained his opinion that defendant Long was volitionally impaired by his sexual disorder by drawing an analogy to alcoholism and compulsive eating, arguing that defendant's sexual urges were so intense and compelling as to be unstoppable without external intervention. Dr. Berlin suggested that defendant could no more resist his sexual desires than a severe alcoholic could turn away from a drink. Even if Dr. Berlin's statements about alcoholism are correct, this argument is unavailing.

The Court agrees with defense counsel and Dr. Berlin that the defendant has a serious sexual disorder; the Court also recognizes that the defendant's disorder in itself is not the result of a volitional decision. *See* Berlin Report at 2. It does not follow, however, that defendant cannot control how, when and with whom to act on his desires. Evidence of powerful sexual addiction does not amount to proof that the defendant was "without the capacity to decide what course of action to take in order to satisfy his addiction." *United States v. Maack*, 59 F.Supp.2d 448, 452 (E.D.Pa.1999).

The defendant is especially culpable in light of his longstanding awareness of his disorder. Before committing the offenses in this case, defendant Long not only had been charged with similar illegal sexual acts, but also had been expressly ordered by the Circuit Court of Pinellas County, Florida, to have no contact with children under the age of 17, except for family members, and not to teach. *See* PSI at 21. As is clear from the record, defendant did not obey the prior court order. He did not avoid contact with children or seek work outside of teaching. Instead, defendant moved to a new area, began teaching even younger students and targeted the most emotionally vulnerable among them. However compulsive his actions once near these children—however strong the temptations that the adolescents evoked—the defendant *chose* to initiate the contact with vulnerable children despite having full knowledge of his sexual disorder. To hold the defendant responsible for this choice is not, as Dr. Berlin suggests, "akin to becoming angry at a blind man for what he did not see." Berlin Report at 3. It is only to hold a sighted man accountable for what he saw but refused to heed.

In a case presenting very similar facts, the Seventh Circuit held that the defendant's receipt, distribution and possession of child pornography, although recognized as " 'a pathological symptom of [his] pedophilia and/or ephebophilia,' did not show that this charged conduct was involuntary or uncontrollable." *United States v. Black*, 116 F.3d 198, 201 (7th Cir.1997). Evidence that a defendant had "confined his computer access to child pornography to periods when his roommate was away from the apartment" demonstrated that the defendant in fact was "able to resist sexually deviant urges and impulses related" to his disorder. *Id.* Here, the record contains ample evidence that defendant Long abused his victims only when he had them alone or in his house, at times when no one would discover or interfere with his sexual abuse. While Dr. Berlin in his testimony explained defendant's efforts to

conceal the abuse as "symptoms of the disorder" that only reveal defendant's lack of volitional control, the Court finds that they show just the opposite. Defendant had the presence of mind and the foresight to conceal his actions and convince the victims not to disclose the abuse. Simply put, the defendant was able to choose and did choose—over the course of many years—to restrain himself strategically in order to satisfy himself ultimately.

█ Another reason why departure is not warranted under Section 5K2.13 is that defendant's disorder already is accounted for under the Sentencing Guidelines. A court may impose a sentence outside the applicable guideline range only if it finds that "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines that should result in a sentence different from that prescribed." U.S.S.G. § 5K2.0 (quoting 18 U.S.C. § 3553(b)). In the instant case, even if the Court were to find that defendant suffered from a significantly reduced mental capacity, defendant's sexual disorder is not so unusual as to warrant departure. Dr. Berlin himself testified that *most* people who commit extra-familial sex offenses have some sexual disorder, and the Eleventh Circuit has held that "[m]any offenders commit crimes because they have poor impulse control. An impulse control disorder is not so atypical or unusual that it separates this defendant from other defendants." *United States v. Miller*, 146 F.3d 1281, 1284 (11th Cir.1998). *See also United States v. Perkins*, 963 F.2d 1523, 1527 (D.C.Cir.1992). If Dr. Berlin is correct that "most" defendants committing crimes similar to defendant Long's suffer from a sexual disorder, then defendants with such disorders simply "cannot be outside of the heartland of the guideline for that offense. If anything, they *are* the heartland." *United States v. Motto*, 70 F.Supp.2d 570, 575 (E.D.Pa. 1999) (emphasis in original). Departure is not warranted under Section 5K2.13.

█ Finally, even if the defendant were found to have suffered from an unusually diminished capacity, a downward departure would be impermissible for reasons of public safety. The Guidelines expressly provide that "the court may not depart below the applicable guideline range if . . . the defendant's criminal history indicates a need to incarcerate the defendant to protect the public." U.S.S.G. § 5K2.13. The Court finds that defendant Long's history presents such a need. While the Court recognizes that "the purpose of [departure based on diminished capacity] is lenity, not harshness, toward those who are mentally or emotionally disabled," *United States v. Cantu*, 12 F.3d at 1516, defendant's history of criminal sexual abuse, as well as the disorder from which it stems, strongly suggests that incarceration is necessary to protect other children from becoming his victims.

First, there is no evidence that defendant is undergoing treatment of any kind, or even that defendant actively wants to receive treatment. While Dr. Berlin testified that defendant acknowledged his wrongdoing during the doctor's interview, this recognition was not accompanied by an affirmative desire to get help. More importantly, the defendant continues to dispute elements of his guilt and minimize his culpability in his conversations with the Probation Officer; he has not shown an acceptance of responsibility or demonstrated a desire to change his behavior. *See* PSI at ¶ 90; Berlin Report at 2 (giving no indication of admission of responsibility or openness to treatment). In light of these facts, the Court finds that the mere possibility of treatment outside a prison setting

does not sufficiently reduce defendant's threat to the public.[12]

Second, defendant's long history of sexual offenses, as shown by his prior arrest record and the testimony of former student AG, *see* Tr. at 2378–2507, indicates a propensity to abuse minors by whatever means possible, including flight from charges, violation of probation, unlawful concealment of past abuses and calculated manipulation of parents and schools to gain control over children. Whatever the nature of his treatment and monitoring, the Court cannot trust that any conditions other than incarceration will protect the public adequately. Because defendant's criminal acts have involved severe, repeated sexual abuse of young victims over long periods of time, the Court is unwilling to depart downward to offer him an earlier opportunity to repeat his acts. The Court sees no factor—past, present or predicted—that lessens the need for long-term incarceration to protect the public from defendant Long. Defendant's motion for downward departure is denied.

### B. Government's Motion for Upward Departure

■ The standard for upward departure from the otherwise applicable guideline sentencing range is the same as that for downward departure, allowing a court to depart only where it finds "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. 3553(b); U.S.S.G. § 5K2.0. A factor is deemed not to have been "adequately considered" by the Commission if it either was not reflected in the applicable guideline at all or was not reflected to the

unusual or exceptional extent that is present in a particular case. *See Koon v. United States,* 518 U.S. 81, 92–96, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); U.S.S.G. § 5K2.0. The burden is on the government to demonstrate by a preponderance of the evidence that an upward departure is appropriate. *See* U.S.S.G. § 6A1.3, Commentary; *United States v. Alberto–Genao,* 28 F.Supp.2d at 663.

The government offers three grounds for upward departure and asserts that, with respect to each, the circumstances of this case go beyond what was adequately considered in setting the guideline sentencing range. With respect to two of these grounds, extreme psychological injury under Section 5K2.3 of the Guidelines and extreme conduct under Section 5K2.8, the Court finds that the circumstances of this case were adequately considered in the formulation of the Guidelines and that no departure is warranted. As to defendant's criminal history, however, the Court agrees that defendant's criminal history category inadequately reflects his past conduct and the likelihood of recidivism. The Court therefore will grant the government's motion for upward departure on the sole ground of inadequate criminal history category and will add five points to the criminal history calculation.

#### 1. Extreme Psychological Injury

■ Under Section 5K2.3 of the Sentencing Guidelines a departure is warranted only where victims have suffered "psychological injury much more serious than that normally resulting from commission of the offense." U.S.S.G. § 5K2.3. Psychological injury normally would be sufficiently severe to warrant departure only when

---

12. Dr. Berlin's belief that defendant Long "can be helped to once again establish a productive and, in this instance safe, life-style," Berlin Report at 3, is far too abstract and hypothetical to justify departure from the Guidelines. *See United States v. Atkins,* 116 F.3d 1566, 1570 (D.C.Cir.1997).

the record shows: (1) a substantial impairment of the intellectual, psychological, emotional or behavioral functioning of a victim (2) that is of an extended or continuous duration and (3) that manifests itself by physical or psychological symptoms or by changes in behavior patterns. *See id.*

In this case, the government argues that all three conditions are proved by the victims' testimony and victim impact statements, which contain accounts of suicidal ideation, self-mutilation (tattooing) and a self-inflicted gunshot to the leg. *See* Government Memo at 24–25. In addition, victims JEG and JLG reported severe depression and anxiety in the wake of the abuse, including flashbacks, paranoia, near-constant depression and one boy's anger that "took over my soul." *See* Letters from JEG and JLG, PSI at 7–9. There is no question that defendant's conduct has caused great pain and suffering to his victims and their families. The victim impact testimony included in the PSI only begins to convey the deep humiliation, anguish and despair and utter loss of faith that defendant's victims have suffered and will continue to suffer for many years.[13] It is indisputable that these victims have suffered the kind of substantial impairment of functioning that Section 5K2.3 contemplates.[14]

This conclusion, however, does not alone justify departure. Although the defendant caused great suffering to his victims, there is no evidence in the record to show that the victims' injuries were "much more serious" than what unfortunately "normally" results from sexual abuse of this kind, sufficient to warrant departure under Section 5K2.3. The government offered no proof—from either expert or lay witnesses—of what is "normal" psychological injury resulting from such abuse or how these victims' injuries exceeded that level. Because proof of extraordinary injury is necessary under Section 5K2.3, the government's motion for upward departure based on extreme psychological injury is denied. *See, e.g., United States v. Fawbush,* 946 F.2d 584, 586–87 (8th Cir.1991) (upward departure not justified for pastor's sexual abuse of children in his day care where only evidence of severe psycho-

---

**13.** JLG: "I'm depressed almost all the time.... I dream that he will escape from jail and kill all of us—me, my mom, my brothers. I wake up and check all the doors. I can't trust anyone anymore. All the things that I like to do, I don't like doing anymore. He just drained all my fun, all my happiness out of my life. He put negative things inside.... I have flashbacks. It keeps on coming and coming. Paranoia, that's what I have.... It affected me a lot. Every day of my life.... I don't talk much anymore.... Long messed up our whole family.... I don't have no friends. I feel like I don't have any feelings.... I see the other boys and girls at the Job Corps laughing and playing. I just stay by myself. Long took that away from me." PSI at 8–10.

JEG: "I get depressed sometimes ... Like you don't want to live anymore.... If there was really a God, he would have stopped this a long time ago.... I've been getting in trouble with the law after all this. I just didn't care anymore.... My brother is the only one I trust.... I failed [school] last year because of all this. All I know is I want my years made up for the classes I missed ... at least give me my one year back." PSI at 7–8.

**14.** *See, e.g. United States v. Anderson,* 5 F.3d 795, 804 (5th Cir.1993) (as a result of kidnaping that involved repeated sexual abuse and explicit death threats, victim "is reluctant to leave the apartment by herself or to be alone at home; she checks every room and closet in her apartment and experiences fears of people hiding in the trees near her apartment; she carries mace with her at all times and has installed extra locks on her windows and doors. She has lost all feelings of confidence, trust, and independence."); *United States v. Ellis,* 935 F.2d 385, 396–97 (1st Cir.1991) (victim suffered "fear of physical harm to herself and her family, and guilt over these traumatic experiences.")

logical injury was counseling received by victim and the opinion of a probation officer); *United States v. Zamarripa,* 905 F.2d 337, 341 (10th Cir.1990) (no basis for finding of extreme psychological injury where victim's therapist could not state that the harm to the victim was greater than normal).

### 2. *Extreme Conduct*

██ Under Section 5K2.8 of the Sentencing Guidelines, a court may depart upward if "the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim." Here, the government argues that defendant's conduct was far more heinous and degrading than typical offenses of this kind. It bases its argument on (1) the ongoing nature of the offenses over several years with several victims; (2) the extreme depravity of one incident involving two victims performing sexual acts together with defendant; (3) the fact that defendant provided alcohol and marijuana to minors to facilitate the abuse; (4) defendant's status as a church pastor and school teacher; and (5) defendant's actions to obtain custody of two of his victims. *See* Government Memo at 33–34. While the law condemns each of these acts, the Court finds that they do not rise to the extreme level required under Section 5K2.8.

Defendant's conduct was sexually exploitative and humiliating to his victims, but it was not equivalent to the kind of cruel and degrading conduct upon which courts have relied to depart upward under Section 5K2.8. *See, e.g., United States v. Anderson,* 5 F.3d at 805 (upward departure based on evidence that victim was "repeatedly raped and forced to engage in oral and anal sex, which is unusually cruel and degrading. The defendants threatened to kill her and described to her, not only tales of others they had killed, but also what they would do with her to destroy any evidence.");

*United States v. Ellis,* 935 F.2d at 387, 397 (departure for extreme conduct was proper based on continuous sexual abuse of young child involving particularly degrading acts, telling the victim that it was "half [her] fault" and belittling her with names like "fatso," "stupid" and "whore."). Because defendant's conduct is adequately punished under the relevant offense guidelines and victim-related adjustments and is not as heinous, cruel, brutal or degrading as in cases where upward departures have been authorized, the government's motion for upward departure based on extreme conduct is denied.

### 3. *Inadequacy of Criminal History Category*

██ Under Section 4A1.3 of the Guidelines, a court may depart upward where "reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3. "A departure under this provision is warranted when the criminal history category significantly under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit further crimes." *Id.* Among the factors that might justify such an upward departure, Section 4A1.3 lists "prior similar adult criminal conduct not resulting in a criminal conviction" and "an extremely lenient sentence for a serious offense." U.S.S.G. § 4A1.3. In this case, both of these factors are present and demonstrate that defendant's criminal history category is not adequate under Section 4A1.3.

Defendant's criminal history category does not consider his prior criminal acts in Manatee County, Florida. In 1990, defendant was charged with multiple counts of sexual abuse, involving solicitation of sexual acts from several students whom he was

teaching at the time. Investigative reports concerning these charges reported conduct that is strikingly similar to the acts underlying the instant offenses, including offering money and gifts in return for sexual favors, isolating particularly susceptible, mentally disabled students for abuse and wielding power as a teacher to coerce students into complying with sexual demands. *See* Government Memo, Attachment B at 1–2. While the charges in Manatee County ultimately were dismissed, this Court nonetheless can rely on the facts set forth in the investigative reports, as well as on the testimony of one student involved in the prior conduct at the trial in this case, *see* Tr. at 2378–2507, to find by a preponderance of the evidence that the defendant did in fact commit the acts underlying the Manatee County charges.

█ In departing under Section 4A1.3 of the Guidelines, "the Commission intends that the court use, as a reference, the guidelines for a defendant with a higher or lower criminal history category, as applicable." U.S.S.G. § 4A1.3. *See also United States v. Robinson,* 991 F.Supp. 1, 3–4 (D.D.C.1997), *remanded on other grounds,* 158 F.3d 1291 (D.C.Cir.1998) (departing downward by one category where criminal history category significantly over-represented the seriousness of defendant's crime). Adjustment of a defendant's criminal history category may be determined either by deciding which category the seriousness of defendant's criminal history most closely resembles, *United States v. Bridges,* 175 F.3d 1062, 1065–66 (D.C.Cir. 1999), or by first reassigning criminal history points and then identifying the correct category from the new calculation. *See United States v. Jones,* 948 F.2d 732, 734–35, 740 (D.C.Cir.1991). For example, in the case of conduct not resulting in a conviction, the Court may look to "what the sentence would have been had the defendant at some prior time been convicted of the conduct at issue," and then assigning the corresponding number of points under Section 4A1.1. *See United States v. Jones,* 948 F.2d at 740 (interpreting *United States v. Ferra,* 900 F.2d 1057 (7th Cir.1990)).

Defendant's prior conduct in Manatee County was serious; it prompted charges of seven counts of Solicitation of a Child for Sexual Acts by a Person in Custodial Authority (a third-degree felony under applicable Florida law at the time defendant was charged, *see* West's F.S.A. § 794.041, Repealed by Laws 1993), one count of Solicitation for Prostitution and one count of Battery. If convicted of these charges, defendant would have been sentenced under Florida law to at least sixty days in prison. Under Section 4A1.1(b) of the Guidelines, the Court would add two criminal history points for such a prior sentence. U.S.S.G. § 4A1.1(b) ("Add 2 points for each prior sentence of imprisonment of at least sixty days not counted in (a)."). The Court therefore will assign two additional criminal history points for defendant's conduct in Manatee County. *See United States v. Jones,* 948 F.2d at 740.

In addition, the defendant received an extremely lenient sentence in Pinellas County, Florida for Procuring a Minor for Prostitution and Soliciting for Prostitution. Because defendant pleaded *nolo contendere* to these charges, the Florida court awarded him a probationary sentence. The actual conduct that triggered the charges, however, is almost as severe as the conduct in this case and is so similar as to demonstrate a common *modus operandi.* In the Florida case, defendant used the word "candy" to describe sexual favors and offered students money to engage in sexual activity, which he then denied when confronted. *See* Government Memo, At-

tachment D at 2–5. Given the severity of his acts, the actual sentence received by defendant was "extremely lenient." *See* U.S.S.G. § 4A1.3. Looking again to Section 4A1.1 of the Guidelines as a reference, the Court finds that defendant's sentence in Pinellas County should have resulted in a sentence of at least sixty days, *see* U.S.S.G. § 4A1.1(b), warranting two criminal history points, rather than the one it was assigned in the PSI. Accordingly, the Court will assign one additional criminal history point under Section 4A1.3.

Finally, defendant's current Criminal History Category does not adequately reflect his extremely high risk of recidivism. The record shows that defendant's pattern of sexual abuse extends far beyond the instant acts. In fact, defendant was engaged in and charged with similar criminal conduct as long ago as 1990. In the time since his earlier offenses, the defendant has taken many steps to conceal his past activities, thus placing himself in positions providing opportunities to continue abusing teens however possible. For instance, defendant relocated and committed sexual offenses in Manatee County after charges had been pending in Pinellas County; made material omissions in his application to teach in Manatee County in order to gain access to a new group of potential victims; fled Manatee County after allegations of sexual abuse surfaced and failed to appear for trial in Pinellas County; applied for a teaching position immediately upon arrival in the D.C. area and signed a false statement denying that he had pending charges of sexual abuse involving a minor; and apparently violated the terms of his Florida probation by having substantial contact with minors. These facts, considered separately and as a totality, show a high risk of recidivism. Because defendant's history indicates that he is likely to keep seeking out vulnerable teens, exploiting them and abusing them for years at a time, the Court finds that an upward departure of two additional criminal history points is warranted under Section 4A1.3.

Assigning two criminal history points for defendant's conduct in Manatee County, one additional criminal history point for his conduct in Pinellas County and two additional criminal history points to account for defendant's extremely high rate of recidivism gives the defendant a total of seven criminal history points rather than two as calculated in the PSI. Seven criminal history points places defendant in Criminal History Category IV. The Court finds that the seriousness of defendant's criminal history "most closely resembles" that of a defendant in Criminal History Category IV, which more accurately reflects defendant's actions than Criminal History Category II. *See* U.S.S.G. § 4A1.3.[15]

Based on defendant's total offense level of 37 and Criminal History Category of IV, the Court concludes that the applicable guideline sentencing range for imprisonment is 292 to 365 months. The maximum permissible statutory sentence under 18 U.S.C. § 2423(a), applicable to Counts Two and Four, is ten years, and the maximum permissible sentence under 18 U.S.C. § 2252(a)(4)(B), applicable to Counts Six and Seven, is five years. *See* 18 U.S.C. § 2252(b)(2). The maximum total punishment allowed therefore is 360 months if the Court were to impose all sentences to run consecutively, pursuant to Section 5G1.2(d) of the Guidelines. Thus, the ef-

15. The government also asks the Court to add two more criminal history points for defendant's repeated sexual abuse of EB in Maryland. Based on the jury's inability to reach a verdict with respect to EB's claims and the Court's recollection of EB's testimony at trial, the Court declines to grant the government's request.

fective guideline sentencing range is 292 to 360 months. At defendant's sentencing, the Court will determine what the appropriate sentence is within that range.

An order consistent with this Opinion will issue this same day.

### ORDER

Upon consideration of the arguments and representations of counsel with regard to sentencing, defendant's motion for a downward departure and the government's motion for an upward departure, and for the reasons stated in the Court's Opinion issued this same day, it is hereby

ORDERED that defendant's motion for a downward departure is DENIED; it is

FURTHER ORDERED that the government's motion for an upward departure is GRANTED in part and DENIED in part; it is

FURTHER ORDERED that the applicable guideline sentencing range in this case is 292 to 360 months; and it is

FURTHER ORDERED that sentencing in this case is scheduled for December 18, 2001, at 11:00 a.m. Any memoranda or other material in aid of sentencing shall be filed and hand delivered to opposing counsel and to Chambers on or before December 13, 2001.

SO ORDERED.